8 A.3d 174

IN THE MATTER OF THE CIVIL COMMITMENT
OF W.X.C., SVP 458–07.

Argued April 26, 2010—Decided November 9, 2010.

182

*Joan D. Van Pelt,* Deputy Public Advocate, argued the cause for appellant W.X.C. (*Stefanie A. Brand,* Acting Public Advocate, attorney; *Ms. Van Pelt* and *Alison S. Perrone,* Designated Counsel, on the briefs).

*Lisa Maria Albano,* Deputy Attorney General, argued the cause for respondent State of New Jersey (*Paula T. Dow,* Attorney General of New Jersey, attorney; *Melissa H. Raksa,* Assistant Attorney General, of counsel; *Ms. Albano* and *Ms. Raksa,* on the brief).

Justice HOENS delivered the opinion of the Court.

In this appeal, we consider a challenge to the constitutionality of the New Jersey Sexually Violent Predator Act (SVPA), *N.J.S.A.* 30:4–27.24 to –27.38. That challenge is both a narrow and specific one in which defendant W.X.C. asserts that the SVPA is unconstitutional as applied to individuals, like himself, who are committed pursuant to its terms when they were not provided with sex offender treatment while incarcerated for their underlying criminal sexual offenses. Defendant bases his constitutional challenge on two related arguments, contending that in those circumstances the SVPA is punitive, therefore violating the federal and state *ex post facto* clauses, *see U.S. Const.* art. I, § 10, cl. 1; *N.J. Const.* art. IV, § 7, ¶ 3, and that it is fundamentally unfair. Because our analysis of the statute compels us to conclude that the SVPA is neither punitive nor unfair, we reject defendant's arguments and we affirm.

I.

The essential facts that gave rise to defendant's conviction, incarceration, and SVPA commitment are set forth in the Appellate Division's published decision affirming the order of commitment. *See In re Civil Commitment of W.X.C.,* 407 *N.J.Super.* 619, 972 *A.*2d 462 (App.Div.2009). We therefore need not repeat either the underlying facts or the opinions expressed by the mental

health professionals that formed the basis for the court's decision that defendant meets the statutory test for SVPA commitment. Rather, because of the narrow focus of defendant's challenge, we need only briefly set forth the relevant facts. In short, over the span of several months in 1992, defendant burglarized two homes multiple times, raping two women who lived in them. One was raped at knifepoint and the other while defendant threatened her by telling her that he had a gun. The second woman was also forced to drive defendant to an automatic teller machine and to withdraw money for him. Later that year, defendant walked into a nursing home where he overpowered his third female victim, dragging her into a bedroom and demanding that she perform a sex act on him. Only the arrival of the police saved her from his assault.

Charged with numerous counts in two indictments, in 1993, defendant entered a guilty plea to two counts of first-degree aggravated sexual assault, *N.J.S.A.* 2C:14–2(a); one count of second-degree attempted aggravated sexual assault, *N.J.S.A.* 2C:14–2(a); one count of first-degree kidnapping, *N.J.S.A.* 2C:13–1(b); two counts of first-degree armed robbery, *N.J.S.A.* 2C:15–1; and one count of second-degree burglary, *N.J.S.A.* 2C:18–2; together with guilty pleas to other crimes not germane to this appeal. The plea agreement called for an aggregate sentence of twenty-four years in prison, with a twelve-year period of parole ineligibility.

Because of the nature of the offenses, defendant was evaluated to determine whether he qualified as a sex offender who would be sentenced to treatment at the Adult Diagnostic and Treatment Center (ADTC) pursuant to the Sex Offender Act, *N.J.S.A.* 2C:47–1 to –10. The essential test for a sentence to the ADTC is whether the offender is a repetitive and compulsive sex offender who is in need of treatment. The ADTC evaluation revealed that although defendant was a repetitive sex offender, he was not a compulsive one, as a result of which he did not meet the statutory criteria for sentencing to the ADTC under the Sex Offender Act.

At sentencing, defendant asked the court to send him to the ADTC in spite of the fact that he did not meet the sentencing criteria. As part of his effort to avoid prison through a sentence to the ADTC, defendant told the court that he had been sexually abused as a child. He later conceded that his claim of sexual abuse was a falsehood he told hoping to gain sympathy from the court so that he might end up with a different or a lower sentence than the one to which he consented in his plea agreement. His efforts were rejected because of the clear constraints on sentencing contained in the Sex Offender Act and he was sentenced in accordance with the plea agreement. During his incarceration, defendant did not request or receive treatment related to his sexual offenses, and he did not request that he be re-evaluated for a transfer to the ADTC.

In 1998, while defendant was serving his sentence, the Legislature enacted the SVPA, which was part of a package of bills recommended in an October 1997 report by the Task Force for the Review of the Treatment of the Criminally Insane. In relevant part, the SVPA created a framework to use in identifying and committing for specialized treatment those sex offenders who were "suffer[ing] from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment." *N.J.S.A.* 30:4–27.26; *see In re Commitment of W.Z.,* 173 *N.J.* 109, 119–21, 801 *A.*2d 205 (2002) (outlining essential provisions of SVPA).

In 2007, as defendant was nearing the end of his prison term, the State filed a petition seeking to have him civilly committed pursuant to the SVPA. Although he had undergone a number of psychological evaluations during his time in prison, he refused to be interviewed by the mental health professionals who would eventually testify at the SVPA commitment proceedings. Instead, defendant immediately challenged the State's petition, arguing that because he had not been provided with sex offender treat-

ment while he was incarcerated, civil commitment would violate the *ex post facto* clauses of the federal and state constitutions.

The civil commitment court rejected defendant's challenge, concluding that the SVPA is not unconstitutional on its face or as applied to someone, like defendant, who did not receive treatment while incarcerated. Based on extensive expert testimony considered during a two-day long commitment hearing, the court concluded that defendant met the statutory test for SVPA commitment. In particular, the court found, by clear and convincing evidence, that defendant is a sexually violent predator who is highly likely to reoffend if not committed to the Special Treatment Unit (STU) and treated. *See In re W.Z., supra,* 173 *N.J.* at 129–31, 801 *A.*2d 205 (analyzing statutory requirement that sex offender be "likely to engage in acts of sexual violence if not confined"). The court therefore declared defendant to be a sexually violent predator and committed him to the STU for treatment.

On appeal, defendant argued, among other things, that the SVPA is unconstitutional either on its face or as applied to individuals who have not been offered treatment during their incarceration. He did not contend that the SVPA is generally punitive, but attacked it as unconstitutional because, in his view, the statute uses civil commitment as a vehicle for further punishment. In a published opinion, the Appellate Division rejected all of defendant's arguments, concluding in relevant part that the SVPA is not unconstitutional on its face or as applied to an individual, like defendant, who was not provided with sex offender treatment at the ADTC during his incarceration. *In re W.X.C., supra,* 407 *N.J.Super.* at 632–39, 972 *A.*2d 462.

We granted defendant's petition for certification, in which he sought our review only of his constitutional attack on the SVPA. 200 *N.J.* 475, 983 *A.*2d 201 (2009).

## II.

Defendant's constitutional challenge to the use of the SVPA to commit an individual who has not been afforded sex offender

treatment while incarcerated has two parts. His first argument is that, as applied, the SVPA violates the *ex post facto* clauses of the federal and state constitutions because it is punitive in the sense that it increases punishment for a crime. In particular, defendant argues that imposing a period of civil commitment on one who has completed a prison term during which no sex offender treatment was provided constitutes additional punishment. Defendant's second argument is that, as applied, the statutes that govern sex offenders are fundamentally unfair because they treat similar sex offenders differently. That is, some offenders are immediately provided with treatment through sentencing to the ADTC under the Sex Offender Act while others, like defendant, are given no treatment even though they may eventually qualify for SVPA commitment, thus violating principles of fundamental fairness. Although to some extent these two arguments overlap, we consider them separately.

## A.

■ This Court has thoroughly analyzed the history and meaning of the *ex post facto* clauses of the federal and state constitutions in addressing an attack on the registration and notification provisions of Megan's Law, *see Doe v. Poritz,* 142 *N.J.* 1, 40–73, 662 *A.*2d 367 (1995). In that context, we concluded that the *ex post facto* protection found in our constitution is not broader than its federal counterpart. *See id.* at 42 n. 10, 662 *A.*2d 367 (concluding that our interpretation of our constitution's *ex post facto* clause should be consistent with United States Supreme Court's interpretation of federal clause).

To summarize the analytical framework briefly, we have noted that a statute violates the *ex post facto* clause if it operates so as to: "(1) punish as a crime an act previously committed, which was innocent when done; (2) make more burdensome the punishment for a crime, after its commission; or (3) deprive a defendant of any defense available according to the law at the time when the crime was committed." *State v. Muhammad,* 145 *N.J.* 23, 56, 678 *A.*2d

164 (1996) (citing *Beazell v. Ohio*, 269 *U.S.* 167, 169–70, 46 *S.Ct.* 68, 68–69, 70 *L.Ed.* 216, 217 (1925)).

In the broadest sense, defendant's constitutional argument is not a new one, for we have previously rejected both an *ex post facto* challenge to the SVPA and a similar attack based on the argument that the statute unconstitutionally imposed additional punishment upon sex offenders. *See In re Civil Commitment of J.M.B.*, 197 *N.J.* 563, 600–01, 964 *A.2d* 752 (rejecting *ex post facto* challenge to SVPA), *cert. denied*, —— *U.S.* ——, 130 *S.Ct.* 509, 175 *L.Ed.2d* 361 (2009); *State v. Bellamy*, 178 *N.J.* 127, 137–38, 835 *A.2d* 1231 (2003) (rejecting argument that civil commitment under SVPA is "direct and penal" consequence of guilty plea; holding that commitment is only "collateral" consequence). As part of our review of the SVPA in each instance, we have specifically emphasized that our Legislature intended to create a civil, rather than a penal, statute. *See, e.g., In re J.M.B., supra,* 197 *N.J.* at 599, 964 *A.2d* 752 ("The SVPA . . . is not a penal statute."); *Bellamy, supra,* 178 *N.J.* at 138, 835 *A.2d* 1231 ("Legislative intent [in enacting SVPA] is regulatory.").

■ In addressing challenges to the SVPA, and in particular in rejecting *ex post facto* attacks on the statute, courts have been guided by the statute's two fundamental purposes. Those purposes are regulatory ones, because the statute is designed to protect the public from dangerous predators and to treat sex offenders who are, by definition, suffering from a mental abnormality. *See In re Civil Commitment of J.M.B.*, 395 *N.J.Super.* 69, 97, 928 *A.2d* 102 (App.Div.2007), *aff'd,* 197 *N.J.* 563, 964 *A.2d* 752 (2009). Those are both permissible legislative goals that protect the community at large and that also provide care for citizens who are in need of treatment and who are unable to obtain it by themselves. *See In re W.Z., supra,* 173 *N.J.* at 125, 801 *A.2d* 205. When the Legislature enacted the SVPA, it chose to serve those purposes, relying on its police powers and its *parens patriae* authority and acting well within the scope of its powers. *Ibid.*

(citing *Addington v. Texas*, 441 *U.S.* 418, 426, 99 *S.Ct.* 1804, 1809, 60 *L.Ed.*2d 323, 331 (1979)).

■ As this Court has held, "the Constitution does not prevent society from attempting to protect itself from convicted sex offenders, no matter when convicted, so long as the means of protection are reasonably designed for that purpose and only for that purpose, and not designed to punish." *Doe, supra,* 142 *N.J.* at 12, 662 *A.*2d 367. In light of these well-reasoned precedents, our consideration of defendant's challenge only requires us to address his particular argument that the SVPA is punitive as applied to sex offenders like himself and, therefore, unconstitutional.

■ We have recognized that by utilizing confinement as part of treatment, the SVPA has some punitive impact, and we have commented that this aspect of the statute is "onerous." *Bellamy, supra,* 178 *N.J.* at 138, 835 *A.*2d 1231. But we have concluded that this does not violate the *ex post facto* clause because it is simply an "inevitable consequence of the regulatory provisions." *Ibid.* (quoting *Doe, supra,* 142 *N.J.* at 46, 662 *A.*2d 367). Instead, as our Appellate Division has noted, the SVPA reflects "a reasoned balance between the liberty interest of a committee in need of treatment for emotional disorders and protection of the citizenry." *In re J.M.B., supra,* 395 *N.J.Super.* at 97, 928 *A.*2d 102. In light of the clear regulatory goals that our Legislature sought to achieve through the SVPA, the choice to include confinement as part of the means through which those goals are achieved does not transform the statute automatically into one that is punitive.

Defendant's challenge to the SVPA, however, goes beyond a facial attack. Instead, his argument is that even if the statute is not punitive in its ordinary operation, it becomes punitive when used to commit an individual like him. That is, he asserts that the SVPA is punitive as applied to an offender who has completed his incarceration and is then adjudged to be in need of treatment, but who was not previously afforded the opportunity to undergo such treatment while incarcerated. He argues, in essence, that there is

an ulterior punitive purpose to the SVPA that renders it unconstitutional as applied to him and others similarly situated.

In part, defendant's argument rests on our recognition that although the SVPA is remedial, see *In re J.M.B.*, *supra*, 197 *N.J.* at 601, 964 *A.*2d 752, and strikes an appropriate balance between the safety interests of the public and the need to provide predators with treatment, we have acknowledged that there remains some room for a challenge:

> [A] statute that can fairly be characterized as remedial, both in its purpose and implementing provisions, does not constitute punishment even though its remedial provisions have some inevitable deterrent impact, and even though it may indirectly and adversely affect, potentially severely, some of those subject to its provisions. Such a law does not become punitive simply because its impact, in part, may be punitive unless the only explanation for that impact is a punitive purpose: an intent to punish.
>
> [*Doe*, *supra*, 142 *N.J.* at 43, 662 *A.*2d 367.]

Based on that language, defendant asserts that there is a hidden punitive intent that makes the statute unconstitutional as applied. We, however, have carefully circumscribed the permissible bounds of searching for a hidden punitive intent:

> [W]hile the role of these constitutional provisions as protectors of individual rights must always be fully enforced, care should be exercised not to convert them into obstacles that prevent the enactment of honestly-motivated remedial legislation by subjecting laws to tests unsuited to the underlying purpose of these constitutional provisions.
>
> [*Ibid.* (citing *Kennedy v. Mendoza–Martinez*, 372 *U.S.* 144, 83 *S.Ct.* 554, 9 *L.Ed.*2d 644 (1963)).]

In light of the important purposes that statutes like the SVPA serve, we have cautioned courts to proceed with care, reminding them "that the most searching inquiry is required before condemning honest laws that are free of punitive intent and designed to protect society." *Ibid.* In particular, when considering the constitutionality of such statutes, "whose sole purpose is remedial and whose provisions are designed solely to achieve that purpose . . . [we decline to conclude] that the inevitable but unintended deterrent impact of a regulatory law by itself renders it punitive or that non-governmental reaction to that law does." *Id.* at 44, 662 *A.*2d 367.

This aspect of defendant's *ex post facto* challenge, as the Appellate Division pointed out, rests in large measure on a United States Supreme Court opinion that sets out a framework that defendant contends our statute cannot meet. *See Kansas v. Hendricks,* 521 *U.S.* 346, 117 *S.Ct.* 2072, 138 *L.Ed.*2d 501 (1997). The United States Supreme Court's decision in *Hendricks,* however, can only be understood by recognizing that its historical antecedent was a Fifth Amendment challenge to a statute that permitted involuntary civil commitment for sexual offenders. *See Allen v. Illinois,* 478 *U.S.* 364, 106 *S.Ct.* 2988, 92 *L.Ed.*2d 296 (1986). In rejecting that challenge, the Court in *Allen* set forth the framework that has been the guide for constitutional attacks on statutes of this type ever since. *Id.* at 368–69, 106 *S.Ct.* at 2992, 92 *L.Ed.*2d at 304. Noting that the statute in question expressly declared itself to be "civil in nature," *id.* at 368, 106 *S.Ct.* at 2992, 92 *L.Ed.*2d at 304 (quoting *Ill.Rev.Stat.,* ch. 38, para. 105–3.01 (1985)), the Court fixed the standard that a challenger must meet: "Where a defendant has provided 'the clearest proof' that 'the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention' that the proceeding be civil, it must be considered criminal." *Id.* at 369, 106 *S.Ct.* at 2992, 92 *L.Ed.*2d at 304 (quoting *United States v. Ward,* 448 *U.S.* 242, 248–49, 100 *S.Ct.* 2636, 2641, 65 *L.Ed.*2d 742, 749 (1980)).

Central to the Court's analysis in *Allen* was its conclusion:

In short, the State has disavowed any interest in punishment, provided for the treatment of those it commits, and established a system under which committed persons may be released after the briefest time in confinement. The Act thus does not appear to promote either of "the traditional aims of punishment—retribution and deterrence."

[*Id.* at 370, 106 *S.Ct.* at 2992, 92 *L.Ed.*2d at 305 (quoting *Mendoza–Martinez, supra,* 372 *U.S.* at 168, 83 *S.Ct.* at 567, 9 *L.Ed.*2d at 661).]

Focusing on the distinctions between the State's goals of punishment and of providing treatment, the Court declined to equate the loss of liberty occasioned by civil commitment with that imposed after criminal prosecution and rejected the challenge to the statute's constitutionality. *Id.* at 373–74, 106 *S.Ct.* at 2994, 92 *L.Ed.*2d at 307.

That background informed the decision in *Hendricks,* in which the Court upheld the constitutionality of a Kansas statute that permitted civil commitment of sexual offenders who were in need of treatment. *Hendricks, supra,* 521 *U.S.* at 371, 117 *S.Ct.* at 2086, 138 *L.Ed.*2d at 521. In rejecting a challenge that the statute was punitive, the Court established that the role of treatment in a state's civil commitment scheme is a key consideration for other courts to use when faced with similar attacks on state statutes aimed at civil commitment of sex offenders. *Id.* at 368–69, 117 *S.Ct.* at 2085, 138 *L.Ed.*2d at 519.

Five members of the Court joined in the majority opinion in which the Court concluded that the Kansas statute was not punitive. *Id.* at 371, 117 *S.Ct.* at 2086, 138 *L.Ed.*2d at 521. Justice Thomas, writing for the Court, addressed the statute by considering its two possible effects. As to sex offenders deemed to be "untreatable," the statute would be constitutional if civil commitment followed a term of imprisonment, even if offenders were to be afforded no treatment during civil commitment. *Id.* at 366, 117 *S.Ct.* at 2084, 138 *L.Ed.*2d at 517–18. However, as to those offenders suffering from a disease or defect that is amenable to treatment, a statute that permits their civil commitment must include treatment as one of its purposes. *Id.* at 366–67, 117 *S.Ct.* at 2084–85, 138 *L.Ed.*2d at 518.

In that evaluation, the Court commented that the goal of treatment need not be the "primary" or even the "overriding" purpose and that a statute is not unconstitutionally punitive even if treatment is only an "ancillary" purpose. *Id.* at 367, 117 *S.Ct.* at 2084, 138 *L.Ed.*2d at 518. Moreover, because the Kansas statute required treatment as part of civil commitment, the fact that the treatment actually afforded to the petitioner was "meager" was not sufficient to undermine the statute's constitutionality. *Id.* at 367–68, 117 *S.Ct.* at 2085, 138 *L.Ed.*2d at 518–19.

Justice Kennedy, who joined the majority, added a concurring opinion in which he commented that the role played by treatment during civil commitment is an important factor in

evaluating the commitment statute's constitutionality. *Id.* at 371, 117 *S.Ct.* at 2087, 138 *L.Ed.*2d at 521 (Kennedy, J., concurring). In his view, if the statute's references to treatment during commitment merely served as a sham or pretext for declining to release an offender who had served his prison term, it would be "an indication of the forbidden purpose to punish." *Ibid.* The Court did not directly address the issue that is now before us, but both the majority and the concurring member of the Court made clear their guiding principle. The key in evaluating statutes that permit civil commitment following incarceration for sex offenders lies in the meaning and intent of the provisions relating to treatment that will be provided during that eventual period of civil commitment.

Defendant's argument, however, is not based on the framework that the Court's majority established in *Hendricks.* Instead, defendant relies solely on the dissenting opinion, written by Justice Breyer, joined by two other members of the Court and joined in part by another. Justice Breyer concluded that the Kansas statute inflicted punishment and therefore violated the *ex post facto* clause. *Id.* at 373–74, 117 *S.Ct.* at 2088, 138 *L.Ed.*2d at 522 (Breyer, J., dissenting). But he did so by using the same key consideration as did the majority, because his analysis also focused on the treatment that would be provided under the Kansas statute during the period of civil commitment. *Id.* at 382–83, 117 *S.Ct.* at 2092, 138 *L.Ed.*2d at 528.

Justice Breyer divided his analysis into four separate considerations. His opinion considered whether the state's highest court had determined that treatment was a significant objective of the statute, *id.* at 383–85, 117 *S.Ct.* at 2092–93, 138 *L.Ed.*2d at 528–30; whether the statute "explicitly defers diagnosis, evaluation, and commitment proceedings until a few weeks prior to the 'anticipated release' of a previously convicted offender from prison," *id.* at 385, 117 *S.Ct.* at 2093, 138 *L.Ed.*2d at 530; whether the statute "require[s] the committing authority to consider the possibility of using less restrictive alternatives," *id.* at 387, 117 *S.Ct.* at 2094, 138 *L.Ed.*2d at 531; and whether, when compared to similar

statutes enacted in other states, it includes "statutory features that indicate a punitive purpose," *id.* at 388, 117 *S.Ct.* at 2095, 138 *L.Ed.*2d at 531–32.

As part of his comparison of the Kansas statute to those of other states, Justice Breyer commented on our SVPA. In an apparent reference to the possibility of an ADTC sentence, he noted that "New Jersey . . . generally do[es] not delay treatment." *Id.* at 388, 117 *S.Ct.* at 2095, 138 *L.Ed.*2d at 532. Nonetheless, he also included New Jersey in the category of states that "delay 'civil' commitment (and treatment) until the offender has served his criminal sentence." *Ibid.* In contrast, however, he categorized our statute favorably by including it among those that "require consideration of less restrictive alternatives" other than civil commitment. *Id.* at 388–89, 117 *S.Ct.* at 2095, 138 *L.Ed.*2d at 532.

Defendant, in relying on Justice Breyer's dissent, does not consider the entirety of that opinion, but focuses instead on only one of Justice Breyer's four factors. More to the point, he relies on a single phrase used by Justice Breyer in his evaluation of how the Kansas statute fell short as to but one of those factors. That is to say, defendant simply points to Justice Breyer's observation that "a legislatively required delay of such treatment until a person is at the end of his jail term (so that further incapacitation is therefore necessary) [makes the] scheme begin[ ] to look punitive." *Id.* at 381, 117 *S.Ct.* at 2091–92, 138 *L.Ed.*2d at 527. That single comment, however, even for Justice Breyer, was not the dividing line between a statute that is constitutional and one that is not. Indeed, critical to his dissent was not so much the timing of treatment, but the determination by the Kansas Supreme Court that the true goal of the statute was not treatment at all, but was instead further incapacitation of offenders through forced segregation from society. *Id.* at 383–85, 117 *S.Ct.* at 2092–93, 138 *L.Ed.*2d at 528–30.

Apart from the fact that Justice Breyer's opinion did not command a majority, and therefore is not binding on this Court, nothing in the *Hendricks* dissent supports the conclusion that

defendant urges us to reach. Instead, were we to apply the construct created by the dissent, we would reach the same result, because, at most, one might conclude that the absence of a program for immediate treatment constitutes the sort of delay to which he referred. *Id.* at 381, 117 *S.Ct.* at 2091–92, 138 *L.Ed.*2d at 527. That single consideration, however, is not enough even under the dissent's four-factor framework. Defendant has pointed to no evidence to suggest that he can overcome the fact that treatment is a significant objective of the civil commitment component of the SVPA, that less restrictive alternatives are considered, and that there are no other statutory features that indicate a punitive purpose when our SVPA is compared to similar statutes enacted in other states.

■ Applying the clear precedents both from the United States Supreme Court and from this Court, our conclusion remains that the SVPA is remedial and regulatory in nature, and that its incidental effects, including the use of confinement as part of the treatment methodology, do not alter the essential character of the statute. We decline to conclude that the SVPA is transformed into a punitive, and therefore unconstitutional, enactment merely because it applies to some individuals, like defendant, who were not provided with specialized treatment prior to civil commitment.

### B.

■ Defendant's second attack on the constitutionality of the SVPA as applied to him and offenders like him is based on a fundamental fairness argument. In short, he contends that not all sex offenders are treated alike, because some qualify for immediate treatment at the ADTC through Sex Offender Act sentencing and others do not. He therefore asserts that the SVPA is fundamentally unfair because it singles out offenders like himself for less favorable treatment.

Addressing this argument requires an examination of the ways in which the diagnostic and treatment criteria included in the SVPA differ from those used in the Sex Offender Act. In the end,

the fatal flaw in defendant's argument lies in its failure to appreciate that the two statutes are designed to serve different purposes and strive to achieve them through different regulatory mechanisms. Seen in that light, there is no basis for defendant's assertion that because only some sex offenders are found eligible for ADTC treatment, there is a constitutional infirmity as to all of the others.

Our analysis is grounded on the history of the Sex Offender Act and the manner in which that statute operates in concert with SVPA commitment. We begin, therefore, with the Sex Offender Act, *N.J.S.A.* 2C:47–1 to –10, and its central theme of addressing sex offenders who are clinically determined to be both repetitive *and* compulsive. The Act's original scope was far broader than its current one, because it directed that any sex offender whose crime resulted from "any form of abnormal mental illness" serve his term at an appropriate institution where treatment would be provided. *See L.* 1949, *c.* 20, § 5. The Act was substantially amended the following year, replacing that broad mandate by limiting treatment to sex offenders clinically determined to have engaged in conduct "characterized by a pattern of repetitive, compulsive behavior." *L.* 1950, *c.* 207, § 3.

█ That statutory change was designed to incorporate recommendations, made by the Commission on the Habitual Sex Offender (Commission), that "more may be accomplished at lower cost by a program of intensive treatment and research on atrocious types of sex criminals." Commission, *The Habitual Sex Offender* 25 (1950). The Commission concluded that the "most dangerous types of sexual offenders constitute, fortunately, a rather small group in the population," *id.* at 20, and that "most sex offenders do not repeat their crimes," *id.* at 22. The Commission explained that sex offenders whose behavior has been clinically found to be "characterized by a pattern of repetitive compulsive behavior" posed the greatest danger to the public and therefore were the offenders who should be the focus of the Sex Offender Act. *Id.* at 25. The requirement that a sex offender's behavior be both

repetitive and compulsive was not designed to initiate sex offender treatment at the earliest possible moment, but rather to limit it to the category of sex offenders that the State determined poses the greatest danger to the public.

Thereafter, in 1998, in conjunction with the enactment of the SVPA, *L.* 1998, *c.* 71, the Legislature again amended the Sex Offender Act, *see L.* 1998, *c.* 72, narrowing the criteria for sentencing to the ADTC. In addition to conditioning admission to the ADTC on an evaluation that the sex offender's behavior satisfies the dual criteria of being repetitive and compulsive, the Legislature decided to narrow admission into that program further by requiring that the sex offender also be amenable to treatment and willing to participate in treatment. *L.* 1998, *c.* 72, § 3. As amended, therefore, four qualifications must coalesce for a Sex Offender Act sentence: repetitiveness; compulsiveness; amenability; and willingness to participate in treatment. *Ibid.*

The Legislature explained that enacting the SVPA and amending the Sex Offender Act would "improve the management and treatment of sex offenders and thereby increase protection of the general public when sex offenders are ultimately released." Sponsor's Statement, *Statement to Assembly Bill 2101* (May 28, 1998). That is, the two new requirements of amenability and willingness were intended to limit treatment at the ADTC to those repetitive and compulsive sex offenders who are able to benefit from it most. The Legislature's decision to tighten the requirements for a sentence to the ADTC was also designed to increase the efficacy of that program based on expert advice. That is, the decision to amend the Sex Offender Act and to focus treatment on a specific population of sex offenders was supported by recommendations made by a special task force created to study the ADTC. *See Report of the Joint Task Force to Study the Adult Diagnostic and Treatment Center* (1995) (*Task Force Report* ).

The *Task Force Report* recommended decreasing the population of inmates at the ADTC because "the ADTC was more effective when it had a much smaller population of inmates to treat." *Id.* at

9. By excluding "therapy refusers" and "inmates whom the treatment staff determines cannot benefit from therapy" from sentencing pursuant to the Sex Offender Act, the ADTC would afford better treatment to those most likely to benefit. *Id.* at 12. At the same time, the treatment offered at the ADTC would be more effective because of the decrease in the population. *Ibid.*

The Sex Offender Act, therefore, not only was in existence long before defendant, was sentenced, but was carefully designed to meet the treatment goals for a particular inmate population. To achieve those goals, the Act enumerates a series of specific sexual crimes and requires the Department of Corrections to conduct an evaluation, prior to sentencing, of anyone convicted of any of those offenses in order to determine whether the offender is eligible for an ADTC sentence. *See N.J.S.A.* 2C:47–1. An offender is only eligible for such a sentence if the evaluation of the offender demonstrates that the criminal conduct was "characterized by a pattern of repetitive, compulsive behavior and further reveals that the offender is amenable to sex offender treatment and is willing to participate in such treatment." *N.J.S.A.* 2C:47–3(a). If so, the statute empowers the court to sentence the offender to be incarcerated at the ADTC for sex offender treatment or to release the offender on probation, conditioned on receiving appropriate outpatient treatment. *N.J.S.A.* 2C:47–3(b).

As defined by statute, ADTC treatment therefore is directed only at specific offenders. Moreover, the treatment provided at the ADTC is particularized and is designed to meet the needs of the specific population of sex offenders that it intentionally targets. Utilizing a five-level program of treatment, *see* Kristen M. Zgoba et al., *Evaluation of New Jersey's Sex Offender Treatment Program at the Adult Diagnostic and Treatment Center: Preliminary Results,* 31 *J. Psychiatry & L.* 133, 144–45 (2003), it is geared only toward a particularized sex offender, one whose criminal sexual behavior was repetitive and compulsive, who is amenable to treatment, and who is willing to participate in treatment. Any offender who meets the repetitive and compulsive

aspect of the statutory test, but who declines to accept treatment at the ADTC or is found to not be amenable to treatment, may request transfer later in a custodial term, *see N.J.S.A.* 2C:47–3(h)(2), –3(h)(3), but an offender who does not meet the essential "repetitive and compulsive" criteria is not eligible, because the statute itself is designed to address only that population of offenders.

As compared to the definition used in the SVPA for purposes of civil commitment and treatment, the defining statutory language in the Sex Offender Act is far narrower, but its design is neither haphazard nor accidental. On the contrary, when creating the ADTC, the Legislature intentionally designed a program that could most effectively target a particular population that available treatment modalities could benefit. In that context, making certain that the offenders admitted into the program are only those who meet the statute's diagnostic criteria is a critical ingredient in the program's success. More to the point, the program operates with limited numbers of beds, for clinically significant reasons, and highly trained, but limited, numbers of personnel, with the result that it is not appropriate to expand it to offenders, like defendant, who do not meet the admission criteria.

Scholarly statistical analysis has demonstrated the wisdom of this targeted approach. *See* Philip H. Witt & Natalie Barone, *Assessing Sex Offender Risk: New Jersey's Methods,* 16 *Fed. Sent'g Rep.* 170 (2004). Using statistics compiled in 2003, the most recent data that was available,[1] that research showed that because of the Sex Offender Act's requirements for a sentence to the ADTC, the State is able to identify the sex offenders most in need of treatment, and for whom treatment can be specifically targeted, and therefore is able to provide those individuals with

---

[1] The 2003 data remains the most recent available. Although the Public Defender and the Attorney General provided this Court with additional statistics relating to the ADTC and STU populations, that information does not include data of the kind that the researchers used in their study and thus cannot serve as the basis for any comparison with their conclusions.

treatment immediately after conviction. *Id.* at 170–72. More to the point, it allows the State to devote scarce resources to effectively treat the offenders who are likely to pose the greatest risk to the public if released without treatment. Those statistics also demonstrate the success of this approach, because in the year studied, out of the 137 repetitive-compulsive sex offenders who were released from the ADTC, only 31 (22.6%) were civilly committed under the SVPA because they were in need of further treatment. *Id.* at 172. In contrast, in the same year, 885 sex offenders were released from the general prison population and of that number, only 25 (2.8%) were found to be in need of SVPA civil commitment. *Ibid.*

The 2003 study demonstrates that the Sex Offender Act operates to provide treatment immediately upon conviction to the category of sex offenders most likely to later face civil commitment pursuant to the SVPA. Other sex offenders may be subject to civil commitment pursuant to the SVPA, but the Sex Offender Act's focus on certain sex offenders, even to the exclusion of others, allows the State to better treat sex offenders at the ADTC who are more dangerous and more likely to benefit from specialized treatment.

■ Viewed in tandem, as they were intended to be, the Sex Offender Act and the SVPA represent a carefully constructed framework for maximizing the goals of both treatment and punishment for offenses. The fact that the State offers a program to a specifically targeted group of offenders does not mean that all other offenders, who do not qualify for that program, are treated in a fashion that is constitutionally infirm. Therefore, the mere fact that some offenders, who meet the definition of sex offenders qualified for treatment at the ADTC, in fact receive that treatment, does not equate with a finding that all other offenders who have committed similar crimes, but who do not meet the stringent ADTC guidelines, are being treated unfairly. On the contrary, the offenders who qualify for a sentence to the ADTC are the ones that the State, pursuing its legitimate regulatory purposes, has

concluded are most likely to benefit from and most in need of the program's unique design. We decline to conclude that an offender, like defendant, who did not qualify for that program based on its legitimate clinical and diagnostic criteria, was entitled to demand admission to the ADTC.

## C.

We return, then, to complete our consideration of whether the SVPA is punitive as applied to defendant. As we have seen, only if there is a hidden punitive purpose to the SVPA's delay in offering treatment can we say that it is unconstitutional as applied. Using that framework, however, nothing in the history of the enactment of the SVPA or the amendments to the Sex Offender Act and nothing in the operation of that statutory scheme suggests such a purpose. Nor does any evidence found in the available statistics support such a claim.

Defendant suggests that the State has created a program of delaying treatment to a class of offenders with the certain knowledge that they will, inevitably, be committed to the STU at the end of their terms and that the SVPA, in the absence of treatment from the beginning of incarceration, is therefore punitive. But the statistics do not bear that out. Instead, the available statistics demonstrate that only a tiny fraction of potentially SVPA-eligible offenders who receive no treatment in prison eventually are civilly committed. Presumably, if defendant is correct, all of those other offenders should have been provided with treatment during their incarceration simply because, based on their criminal offenses, they might fall within the small percentage of offenders who cannot be released after serving a prison term because they meet the criteria the Legislature used in the SVPA for purposes of protecting the public and offering treatment. Apart from the untold cost of such a scheme, it would inevitably trample upon the rights of other offenders, both because it would threaten the success of the ADTC by making that population unmanageable and because it would impact on the rights of the offenders who would otherwise complete their terms of incarceration and be

released without the need for any treatment at all. In light of that stark evidence, we will not substitute defendant's preferred method of providing treatment for the one that was carefully chosen by our Legislature.

This Court previously considered whether an inmate who qualifies for a treatment program has a fundamental constitutional right to substitute that program for incarceration. *See State v. Howard,* 110 *N.J.* 113, 539 *A.*2d 1203 (1988). In addressing the argument of an inmate who was eligible for treatment at the ADTC, but who was held in the county jail pending a transfer there, we rejected the suggestion that incarcerating him rather than treating him violated his due process rights. *Id.* at 132, 539 *A.*2d 1203. In particular, we noted that the time the inmate spent awaiting transfer was well within the span of his full sentence. *Id.* at 133, 539 *A.*2d 1203. We recognized that "[i]n a more perfect world, defendant's rehabilitative treatment would have started earlier," but held that the delay was not unconstitutional because there is no right to sex offender treatment during a custodial term. *Id.* at 132–33, 539 *A.*2d 1203; *see also State v. Falcone,* 211 *N.J.Super.* 685, 697–98, 512 *A.*2d 576 (App.Div.1986) (noting that some sex offenders sentenced pursuant to Sex Offender Act must wait in county jails until space is available at ADTC).

There is, in the final analysis, no basis on which to conclude that there is any constitutional infirmity in the SVPA as applied to defendant or others like him who do not qualify for ADTC treatment, who therefore do not access specialized sex offender treatment during their incarceration, and who thereafter are deemed to be sexually violent predators as to whom civil commitment for treatment at the STU is appropriate. The operation of the SVPA is neither punitive nor fundamentally unfair and we therefore reject defendant's arguments that it is unconstitutional as applied to him and other offenders like him.

## D.

We conclude with a few observations prompted by the approach advanced in the dissent. Our dissenting colleague concludes that

the statutory framework created by the operation of the Sexual Offender Act and the Sexually Violent Predator Act is unconstitutional, because it deprives inmates of their due process rights, *post* at 205–06, 8 *A*.3d at 189, and because it violates their Eighth Amendment protection against cruel and unusual punishment, *post* at 213–14, 8 *A*.3d at 194. Describing the statutory framework as "a charade," *post* at 206, 8 *A*.3d at 189, and denouncing it as "irrational," *post* at 216, 8 *A*.3d at 195, and "bizarre," *post* at 214, 8 *A*.3d at 195, the dissent asserts that "this unconstitutional scheme should not be allowed to continue," *post* at 206, 8 *A*.3d at 190.

 Although insistent in its tone, the dissent's constitutional argument rests on factual and legal propositions that are simply false. First, the dissent presumes that one can identify at the time of sentencing those sex offenders who will eventually be committed to the STU. That assumption, however, is unsubstantiated. Although there are well established methods to differentiate between the sexual offenders who meet the test for an ADTC sentence and those who do not, as among the latter group, that is, the sexual offenders who are sent to prison, there is no way to identify which of them will be among the few who will eventually be committed pursuant to the SVPA. The record reveals none and the dissent points to none. To the extent that the dissent relies on the fact that half of the total number of inmates committed to the STU come from prison rather than from ADTC, *see post* at 216–18, 8 *A*.3d at 196–97, it either misunderstands or misuses the available statistics. Comparing the numbers of offenders committed to STU while ignoring the larger universe of originally-sentenced offenders from which that number is drawn overlooks the fact that the vast percentage of sex offenders found ineligible for ADTC are released from prison; only a tiny fraction of those offenders are committed to the STU. In the absence of a predictive tool that will identify which offenders those would be, the dissent, in reality, is arguing for sex offender treatment for every single inmate who has been convicted of a sex offense, regardless

of whether any of them actually would benefit from such a scheme. The constitution does not so require.

Second, the dissent's Eighth Amendment argument is fundamentally flawed. No court has concluded that the failure to provide sex offender treatment during incarceration equates with cruel and unusual punishment and the dissent does not point to any. Rather, the dissent relies on the well-settled Eighth Amendment decisions addressing deliberate indifference to a known substantial risk of harm or to serious medical needs, implying that those pronouncements support its novel conclusion. *See post* at 212–14, 8 *A.*3d at 193–94. Of course, failing to treat physical injuries, *see Estelle v. Gamble,* 429 *U.S.* 97, 104, 97 *S.Ct.* 285, 291, 50 *L.Ed.*2d 251, 260 (1976) (holding that "deliberate indifference to serious medical needs of prisoners" gives rise to Eighth Amendment claim), or knowingly exposing a particular inmate to the risk of harm from other inmates, *see Farmer v. Brennan,* 511 *U.S.* 825, 832–33, 114 *S.Ct.* 1970, 1977, 128 *L.Ed.*2d 811, 823 (1994) (applying Eighth Amendment and remanding transgender inmate's claim that his rights were violated by being placed in general male population known for high rate of inmate assaults), or otherwise denying an inmate "adequate medical care" consistent with "basic human needs," *see DeShaney v. Winnebago County Dep't of Social Servs.,* 489 *U.S.* 189, 199–200, 109 *S.Ct.* 998, 1005–06, 103 *L.Ed.*2d 249, 261–62 (1989) (noting, in dicta, that the state has a duty to provide for the "basic human needs" of individuals whose liberty is restrained), are all recognized Eighth Amendment interests. Although the dissent equates an inmate's mental abnormality with a medical need, *post* at 213–14, 8 *A.*3d at 194, medical needs have not been defined so broadly, but instead have been found to be of far more limited scope. *See Monmouth County Corr. Instit. Inmates v. Lanzaro,* 834 *F.*2d 326, 347 (3d Cir.1987) (defining serious medical need as "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.").

Finally, the dissent's reliance on decisions concerning the rights that civilly committed, mentally disabled, persons have to treatment, *see Youngberg v. Romeo,* 457 *U.S.* 307, 317–18, 102 *S.Ct.* 2452, 2459, 73 *L.Ed.*2d 28, 37–38 (1982) (holding that the state may have to provide mentally disabled individuals who are civilly committed with training to avoid unconstitutional infringement of Eighth Amendment rights), confuses the rights that this defendant might have after he is committed to the SVPA with the rights that he might or might not have while incarcerated. As the United States Supreme Court held, "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.* at 321–22, 102 *S.Ct.* at 2461, 73 *L.Ed.*2d at 41.

Our dissenting colleague calls upon the Legislature to take up the suggestion of the Appellate Division's concurring judge and revisit these statutes. *Post* at 216–17, 8 *A.*3d at 196 (quoting *In re W.X.C., supra,* 407 *N.J.Super.* at 643, 972 *A.*2d 462). The Legislature may well choose to revisit the statutes relating to sex offenders, and it might do so in light of the fact that this specific offender was identified as a potential SVPA committee two years before his expected release. However, there being no constitutional infirmity in the statutory framework now in place governing sex offenders, that choice remains one that is for the Legislature to make.

## III.

The judgment of the Appellate Division is affirmed.

Justice ALBIN, dissenting.

Today, the majority holds that the State can both deny treatment to a prison inmate who suffers from "a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence," *N.J.S.A.* 30:4-27.26, and then use the inmate's failure to receive such treatment as the basis for his civil

commitment under the Sexually Violent Predator Act, *N.J.S.A.* 30:4–27.24 to –27.38. Denying an inmate treatment for a mental abnormality or personality disorder and then, when he is about to be released after serving his sentence, justifying his civil commitment because of a lack of treatment is not a rational public policy but a charade that violates fundamental rights guaranteed under both the United States and New Jersey Constitutions.

Nevertheless, I would not grant W.X.C. the relief he seeks—his freedom—because his release would present an immediate danger to the public, even if his status as an unrehabilitated sex offender can be laid at the feet of the State.[1] Although the public should not suffer because the State has ignored the rights of this former inmate, this unconstitutional scheme should not be allowed to continue. Going forward, when the State knows or has a reasonable belief that one of its inmates is suffering from a mental abnormality or personality disorder that will likely render him subject to civil commitment under the Sexually Violent Predator Act, in my view, our federal and state constitutions mandate that the State treat or attempt to treat the inmate before initiating civil-commitment proceedings.

I therefore respectfully dissent.

## I.

In 1993, W.X.C., then twenty-five years old, pled guilty to committing violent sexual crimes and related crimes against three women on three separate occasions. Among the crimes to which W.X.C. pled guilty were two aggravated sexual assaults, an attempted aggravated sexual assault, kidnapping, two armed robberies, and several burglaries. At the time he entered guilty pleas to those crimes, W.X.C. told the court: "I realize I have a debt to pay back to society for what I have done ... and it is

---

[1] Whether W.X.C. should be able to seek other relief under either the federal civil rights statute, 42 *U.S.C.* § 1983, or our State's cognate civil rights provision, *N.J.S.A.* 10:6–1 to –2, is not a matter before us.

obvious from the crimes that it is repetitive and compulsive, I'm asking I want to be rehabilitated.... I want treatment. I don't want to be released until I am rehabilitated." The court advised W.X.C. that he first would have to be evaluated to determine whether he was eligible for a sentence to the Adult Diagnostic and Treatment Center (ADTC) at Avenel. At the time, under the Sex Offender Act, if a psychological examination of "the offender's conduct was characterized by a pattern of repetitive, compulsive behavior," then the court, "upon the recommendation of the [ADTC]," had the discretion to sentence the offender to the ADTC "for a program of specialized treatment for his mental condition...." *N.J.S.A.* 2C:47–3(a) (1979) (current version at *N.J.S.A.* 2C:47–3(a)). Any sentence to the ADTC still had to comport with the sentencing provisions of the Code of Criminal Justice. *N.J.S.A.* 2C:47–3(b) (1979) (current version at *N.J.S.A.* 2C:47–3(c)).[2]

Dr. Mark Frank, the psychologist who evaluated W.X.C. for the Department of Corrections, determined that W.X.C. was a repetitive offender. Dr. Frank, however, believed that W.X.C.'s case presented "diagnostic difficulties" in determining whether his conduct could be deemed "compulsive." On the one hand, W.X.C.'s sexual misconduct could be considered "motivated by a deviant sexual arousal pattern that reflects repetitive, compulsive sexual pathology." On the other hand, W.X.C.'s offenses could "be best understood within the broader context of [his] overall antisocial orientation with concomitant hedonistic and exploitive tenden-

---

[2] Since W.X.C.'s sentencing, the Sex Offender Act has been amended several times. *See L.* 1994, *c.* 130, § 6; *L.* 1994, *c.* 134, § 2; *L.* 1998, *c.* 72, § 3. The Act now provides that if a psychological examination conducted by the Department of Corrections concludes that "the offender's conduct was characterized by a pattern of repetitive, compulsive behavior *and that the offender is amenable to sex offender treatment and is willing to participate in such treatment," N.J.S.A.* 2C:47–3(b) (emphasis added), and the court makes the same determination, then, "upon the recommendation of the [Department]," the court must order the defendant to serve his sentence at the ADTC, *ibid.* Therefore, a precondition for treatment at the ADTC is that the offender be "amenable to sex offender treatment" and "willing to participate in such treatment. .."

cies." [3] Because in Dr. Frank's mind the "preponderance of the evidence" favored the second hypothesis, he ruled W.X.C. ineligible for treatment at the ADTC, although he recommended psychotherapy given "the serious nature of these offenses."

At sentencing, in 1994, W.X.C. and his attorney asked the court to sentence him to the ADTC for sex-offender treatment. Because of Dr. Frank's report, W.X.C. was not eligible for such treatment, and the court sentenced him instead to serve a state-prison term of twenty-four years with twelve years of parole ineligibility. From 1994 through July 2007, W.X.C. remained in the custody of the Department of Corrections and received no sex-offender specific treatment.

In 1998, the Legislature enacted the Sexually Violent Predator Act (SVPA), *N.J.S.A.* 30:4–27.24 to –27.38, "in recognition of the need for commitment of those sexually violent predators who pose a danger to others should they be returned to society." *N.J.S.A.* 30:4–27.25(c). To involuntarily commit an offender under the SVPA, the State must prove by clear and convincing evidence that the offender is a "sexually violent predator." *N.J.S.A.* 30:4–27.32(a). A sexually violent predator is defined as a "person who has been convicted ... of a sexually violent offense ... and suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment." *N.J.S.A.* 30:4–27.26.

From 1995 to 2007, W.X.C., while in prison, attended a variety of treatment programs, including alcoholics anonymous, narcotics anonymous, substance abuse counseling, twelve-step relapse prevention counseling, anger management, encounter and peer group

---

[3] Among other materials reviewed by Dr. Frank was a post-arrest statement of W.X.C. in which he admitted that (1) he had burglarized the homes of two of the victims before returning to rape them; (2) burglarizing homes made him masturbate a lot; (3) he frequently masturbated to a movie that depicted "dead actors"; (4) he was aroused because the victims were scared of him; and (5) he had a sexual problem and knew he needed help.

counseling, and behavior modification counseling. He also partici-
pated in employment training in business management, culinary
arts, and furniture building. He had no record of institutional
infractions during twelve years of incarceration in state prison.
However, W.X.C. was not offered sex-offender specific therapy.

About two years before his scheduled release from prison,
W.X.C. was evaluated for civil commitment under the SVPA. In
September 2005, Dr. Frank, the same psychologist who found
W.X.C. ineligible for sex-offender treatment in 1994, interviewed
and evaluated W.X.C. again. Dr. Frank recommended that the
Attorney General review W.X.C.'s case for civil commitment under
the SVPA. Dr. Frank found that W.X.C. "does not appear to have
had any appreciable sex-offender specific psychotherapy guided by
a treatment specialist." In addition, Dr. Frank reported:

> [W.X.C.] has apparently yet to work intensively in sex offender specific psychother-
> apy in either a group or individual modality. Clearly, this type of treatment is
> indicated, as is continued treatment for substance abuse. If [W.X.C.] is paroled,
> extremely close supervision and monitoring for substance abuse is recommended,
> along with mandated sex offender specific psychotherapy.

Still, the Department of Corrections offered W.X.C. no specific
sex-offender treatment that might mitigate the need for his civil
commitment.

In March 2007, Dr. Wayne Blodgett, a psychologist who inter-
viewed and evaluated W.X.C. in prison, came to the following
conclusion: "Clinical and actuarial findings indicated this inmate
*does* meet the criteria as a Sexually Violent Predator who requires
formal treatment before being released to the community. Hence
this inmate *should* be referred to the NJ Attorney General's office
for consideration of commitment under" the SVPA.[4]

On April 22, 2007, Dr. Neal Brandoff, a psychiatrist employed
by the University of Medicine and Dentistry, examined and evalu-
ated W.X.C. at Riverfront State Prison. In support of the State's

---

[4] A month after submission of Blodgett's report, Dr. Susan Uhrich, a psychia-
trist, conducted an evaluation of W.X.C. and concluded that he did not meet the
criteria for commitment under the SVPA.

petition for involuntary commitment, Dr. Brandoff wrote: "[W.X.C.] had no sex offender specific therapy, saying none was recommended nor available; he studied what written materials he could obtain on his own about sex offending."

On April 24, 2007, the day W.X.C. was scheduled to be released from prison, a Superior Court judge granted the State's petition to temporarily commit him to the Special Treatment Unit (STU). On May 17, 2007, in anticipation of the commitment hearing, Dr. Evan Feibusch, on behalf of the State, evaluated W.X.C.'s case, concluding that W.X.C.'s risk of recidivism was high and that he had "not moderated his risk through treatment. He has not had treatment for his sexually inappropriate behavior."

Several months later, another Superior Court judge conducted a commitment hearing pursuant to the SVPA. Based on the testimonies of Dr. Feibusch, a staff psychiatrist at the STU (Woodbridge), and Dr. Brian Freidman, a staff clinical psychologist at the STU (Kearney), the judge concluded that W.X.C. is a sexually violent predator who "suffers from abnormal mental conditions and personality disorders" that make it "highly likely that [W.X.C.] will commit sexually violent offenses in the foreseeable future if he is not committed for care and for the protection of the public."

## II.

The justification for the civil commitment of W.X.C. rested, to a great degree, on the sexually violent acts he committed fifteen years earlier and the failure to receive sex-offender specific treatment while in prison. The State should have known at the time of W.X.C.'s sentencing that he was in need of sex-offender specific treatment if he were to successfully transition back to society upon his release from prison. Certainly, the State should have known as much when the SVPA was passed in 1998. Twenty-two months before W.X.C.'s scheduled release, the State unquestionably knew W.X.C. was in need of sex-offender treatment. That is so because the very tests to determine if a person is suitable for civil commitment demonstrated the need for treatment. Almost

every evaluation confirmed that W.X.C. was dangerous without sex-offender specific treatment. Yet he received no treatment.

At issue here is not the constitutionality of a civil-commitment statute, such as the Sexually Violent Predator Act, that serves the non-penal objective of institutionalizing sexually violent predators for the purpose of treating their mental abnormalities and personality disorders with the objective of making it likely that they will not re-offend. Rather, the issue is about a larger scheme—the intersection of our penal and civil-commitment systems—that allows the State to deny an inmate, over whom it has total control, treatment for a mental abnormality that will later be the basis for the State's justification to civilly commit him.

The constitutionality of a civil-commitment statute, such as the SVPA, requires that the state offer treatment to those who are willing to receive and benefit from it. *See Kansas v. Hendricks,* 521 *U.S.* 346, 367–69, 117 *S.Ct.* 2072, 2084–85, 138 *L.Ed.*2d 501, 518–19 (1997) (Thomas, J., plurality opinion) (noting that treatment must be one purpose of valid civil-commitment statute so as not to run afoul of ex post facto clause); *see also id.* at 371–72, 117 *S.Ct.* at 2087, 138 *L.Ed.*2d at 521 (Kennedy, J., concurring) (noting that provision for treatment in civil-commitment statute may not be "sham or mere pretext" to conceal "forbidden purpose to punish"). It is understood that some, if not many, sexually violent predators may be untreatable and that even the state's best efforts will not be sufficient to allow their release into society. Nonetheless, treatment must be offered to those who are treatable.

New Jersey's SVPA is non-penal in nature and does not offend the substantive due process provisions of the federal and state constitutions because the Act provides for treatment of sexually violent predators. *See In re Commitment of W.Z.,* 173 *N.J.* 109, 133–34, 801 *A.*2d 205 (2002). The SVPA declares that "[c]ertain individuals who commit sex offenses suffer from mental abnormalities or personality disorders which make them likely to engage in repeat acts of predatory sexual violence *if not treated for*

*their mental conditions."* *N.J.S.A.* 30:4–27.25(a) (emphasis added). The SVPA specifically provides that "[t]he Department of Corrections shall be responsible for the operation of any facility designated for the *custody, care and treatment of sexually violent predators ....*" *N.J.S.A.* 30:4–27.34(a) (emphasis added). The Department of Human Services is required to "provide or arrange for treatment for a [sexually violent predator] committed" under the SVPA, and that treatment must "be appropriately tailored to address the specific needs of" that person. *N.J.S.A.* 30:4–27.34(b). Treatment of the offender lies at the very core of the SVPA.

The State, which confined W.X.C. in prison for more than twelve years without providing him with sex-offender specific treatment, now is responsible for providing him the very "care and treatment" it denied him—treatment that may have made his civil commitment less likely. Because the State determined during W.X.C.'s imprisonment that he would be subject to civil commitment under the SVPA and because the State had complete control over every aspect of his life, it had the obligation to provide him with sex-offender specific treatment directed at his "mental abnormality or personality disorder." That obligation arises from the State's special relationship with those who are stripped of their freedom and confined in custodial institutions, and who therefore cannot obtain treatment for themselves.

In *DeShaney v. Winnebago County Department of Social Services,* 489 *U.S.* 189, 109 *S.Ct.* 998, 103 *L.Ed.*2d 249 (1989), the United States Supreme Court held:

> [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., *food, clothing, shelter, medical care, and reasonable safety*—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.
>
> [*Id.* at 200, 109 *S.Ct.* at 1005–06, 103 *L.Ed.*2d at 261–62 (emphasis added) (internal citations omitted).]

As noted in *DeShaney*, the State's affirmative duty to a prisoner is, in part, grounded in the Eighth Amendment's prohibition against cruel and unusual punishment. *U.S. Const.* amend. VIII; *see Estelle v. Gamble*, 429 *U.S.* 97, 104–05, 97 *S.Ct.* 285, 291, 50 *L.Ed.*2d 251, 260 (1976) (holding that Eighth Amendment prohibits State from acting with deliberate indifference to serious medical need of inmate).[5] "[H]aving stripped [inmates] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials" are under a constitutional obligation to "ensure that [they] receive adequate clothing, shelter and medical care...." *Farmer v. Brennan*, 511 *U.S.* 825, 832–33, 114 *S.Ct.* 1970, 1976–77, 128 *L.Ed.*2d 811, 822–23 (1994). Clearly, an inmate suffering from a "mental abnormality or personality disorder" that renders him a sexually violent predator and subject to civil commitment is in need of "medical care."

Although generally the State may not be obliged to provide sex-offender specific therapy to those imprisoned, the deprivation of treatment takes on constitutional significance when it is used to civilly commit a person. Surely, the withholding of treatment may be considered "sufficiently serious" when it "result[s] in the denial of the minimal civilized measure of life's necessities"—the ability of a convicted person to be released after serving his prison sentence. *See id.* at 834, 114 *S.Ct.* at 1977, 128 *L.Ed.*2d at 823 (internal citations and quotation marks omitted); *see also In re Commitment of J.M.B.*, 197 *N.J.* 563, 598, 964 *A.*2d 752 (2009) ("[W]hen addressing application of the SVPA, we have emphasized that [c]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.") (internal citations and quotation marks omitted); *cf. Youngberg v. Romeo*, 457 *U.S.* 307, 317–18, 102 *S.Ct.* 2452, 2459, 73 *L.Ed.*2d 28,

---

[5] Analogous protections are found in our State Constitution. W.X.C. has a liberty interest under the substantive-due-process guarantee of Article I, Paragraph 1, *see Lewis v. Harris*, 188 *N.J.* 415, 434–35, 908 *A.*2d 196 (2006), as well as a right to be free from "cruel and unusual punishments" under Article I, Paragraph 12.

37–38 (1982) (stating that because "there is a constitutionally protected liberty interest in safety and freedom from restraint, training may be necessary to avoid unconstitutional infringement of those rights" possessed by involuntarily committed, mentally retarded patients).

Here, the State maintained physical custody of and control over W.X.C. as an inmate. In prison, W.X.C. did not have access to an appropriate therapeutic program to treat sex offenders unless the State provided it to him.[6] In denying him appropriate treatment, the State maximized the likelihood that W.X.C., upon his release from prison, would be deprived of his freedom on the ground that he was an untreated sexually violent predator.[7] The irony is that the Department of Corrections controlled every aspect of W.X.C.'s life while he was imprisoned for twelve years and now *it* is responsible for the operation of the facility designated for W.X.C.'s "custody, care and treatment" as a sexually violent predator. *See N.J.S.A.* 30:4–27.34(a). This bizarre scheme of denying an imprisoned inmate treatment for a mental abnormality or personality disorder and then committing him as an untreated sexually violent predator cannot be justified under either the federal or state constitution.

---

[6] A person engaged in a sex-offender specific treatment program progresses through phases or stages in which he must demonstrate increasing responsibility and positive behavioral changes. *See* John Kip Cornwell, John V. Jacobi & Philip H. Witt, *The New Jersey Sexually Violent Predator Act: Analysis and Recommendations for the Treatment of Sexual Offenders in New Jersey*, 24 *Seton Hall Legis. J.* 1, 17–18 (1999). These programs are typically conducted in group settings and require evaluation from medical professionals and other institutional staff. *Id.* at 17–19.

[7] The treatment offered at the ADTC consists of cognitive-behavioral treatment and relapse prevention intended to minimize future sexually harmful behavior. Sabrina R. Haugebrook & Kristen M. Zgoba, *Prison Group Counseling*, in *Correctional Counseling & Treatment* 149, 161 (Albert R. Roberts, ed., 2007). These therapies are associated with a reduction in sexual recidivism. *Id.* at 162. To the extent that these therapies have the potential for success, treatment is liberty protecting.

## III.

I cannot agree with the majority that "the Sex Offender Act and the SVPA represent a carefully constructed framework for maximizing the goals of both treatment and punishment. . . ." *Ante* at 200, 8 *A.*3d at 186. Rather, as Justice Holmes once famously said, "a page of history is worth a volume of logic." *New York Trust Co. v. Eisner*, 256 *U.S.* 345, 349, 41 *S.Ct.* 506, 507, 65 *L.Ed.* 963, 983 (1921). It is the historical development of our law that best elucidates the asymmetrical approach to treatment of inmates. Logic does not explain why a sex offender driven by repetitive, compulsive behavior is eligible for a sentence to the Adult Diagnostic and Treatment Center but a sex offender who suffers from "a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence" is not.

The Sex Offender Act, *N.J.S.A.* 2C:47–1 to –10 (as successor to *N.J.S.A.* 2A:164–1 to –12), pre-dates the Sexually Violent Predator Act, *N.J.S.A.* 30:4–27.24 to –27.38, by almost a half century. At the time of the enactment of the Sex Offender Act, and the establishment of the Adult Diagnostic and Treatment Center, the Legislature obviously concluded that only those offenders whose "conduct was characterized by . . . [a] pattern of repetitive, compulsive behavior" should be eligible for "a program of specialized treatment for [their] mental and physical aberrations." *N.J.S.A.* 2A:164–5(a), (c) (1956) (current version at *N.J.S.A.* 2C:47–3). The purpose of a sentence to the ADTC was the rehabilitation of the offender, treating him so that he was "capable of making an acceptable social adjustment in the community." *N.J.S.A.* 2A:164–8 (1951) (current version at *N.J.S.A.* 2C:47–5). When the Sex Offender Act was passed, civil commitment for sexually violent predators was not an option, unless such sexual offenders met the general test for civil commitment. *See N.J.S.A.* 30:4–26.1 (1953) (current version at *N.J.S.A.* 30:4–27.1 to –27.23).

The enactment of the Sexually Violent Predator Act was ushered in during a different age, when the Legislature had greater

knowledge and a better understanding of the grave threat that an unrehabilitated sex offender posed to society. That Act, presumably, reflects the current state of psychological and behavioral science pertaining to sexually violent predators. But the failure of the Legislature to provide for treatment of those imprisoned who suffer "a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence" is not evidence of an intelligent design, but more likely oversight. As a result of the current irrational and therefore unconstitutional scheme, potentially treatable sex offenders in the general prison population of our State will be civilly committed because they have not been treated while incarcerated.

The anomalous outcomes from the two statutory schemes led Judge Stern in his concurring opinion in *In re Civil Commitment of W.X.C.* to suggest "that the Legislature should revisit the Sex Offender Act ... in light of subsequent developments concerning the treatment of sex offenders." 407 *N.J.Super.* 619, 643, 972 *A.*2d 462 (App.Div.2009). Judge Stern understood that there may be no valid reason "to delay the treatment of sex offenders who do not now fall within the purview of [the Sex Offender Act]" and that "[o]ur sentencing and treatment of sex offenders may well benefit from legislative review...." *Ibid.*

The statistics that the majority asserts demonstrate the constitutionality of the current legislative scheme, I believe, prove just the opposite. According to a 2003 study relied on by the majority, thirty-one persons released from the ADTC were civilly committed under the SVPA whereas twenty-five inmates released from the general prison population were similarly committed. *Ante* at 197–98, 8 *A.*3d at 184–85. That means that of the fifty-six persons committed under the SVPA in 2003, the State did not provide sex-offender specific treatment for forty-five percent of prison inmates—the twenty-five who came from the general prison population.

A constitutional success story is not when nearly half of prison inmates civilly committed as sexually violent offenders were de-

prived of sex-offender specific treatment and the lack of treatment played a role in the justification for their civil commitment. The constitutional right to substantive due process—the right to be free from unnecessary governmental restraint—should be available to every person, however disfavored or despised he may be. Constitutional rights are not rationed based on a utilitarian theory that when a majority of some subject class receives the benefit of a right, those who do not should be equally content.

The majority does not explain why at the time of sentencing—for treatment purposes—psychological experts and courts are able to determine that an offender is repetitive and compulsive, but not that an offender suffers from a mental abnormality or personality disorder that would make him eligible for commitment as a sexually violent predator. Certainly a court has no trouble making the sexually violent predator determination at the time of civil commitment. The majority does not give a satisfying reason why offenders most likely to be subject to civil commitment will not receive treatment during their incarceration. A scheme that is unconstitutional should not have greater currency because—as the majority suggests—no court has said so yet.

## IV.

Under the present statutory scheme, inmates who do not satisfy the criteria for placement under the Sex Offender Act, but who do meet the definition of a sexually violent predator, are denied the very treatment that may save them from civil commitment at the end of their criminal confinement. When the State knows or has a reasonable belief that an inmate in its custody suffers a mental abnormality or personality disorder that makes him eligible for civil commitment under the SVPA, the State must offer the inmate sex-offender specific therapy before it commences civil-commitment proceedings. That is because an inmate has a fundamental liberty interest in securing his freedom after serving his sentence. The State cannot deny an inmate sex-offender specific treatment and then use his failure to receive such treatment as the basis for

his civil commitment under the SVPA, consistent with the due-process guarantees of our federal and state constitutions.

I therefore respectfully dissent.

*For affirmance*—Chief Justice RABNER and Justices LaVECCHIA, WALLACE, RIVERA–SOTO and HOENS—5.

*For reversal*—Justices LONG and ALBIN—2.