835 A.2d 1231

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
JERRY L. BELLAMY, DEFENDANT–APPELLANT.

Argued September 9, 2003—Decided December 11, 2003.

*James K. Smith, Jr.,* Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney; *Mr. Smith and Brian L. Zavin,* Assistant Deputy Public Defender, on the briefs).

*Mary Beth Wood and Kristen M. Harberg,* Deputy Attorneys General, argued the cause for respondent (*Peter C. Harvey,* Attorney General of New Jersey, attorney; *Robert E. Bonpietro,* Deputy Attorney General, of counsel, *Ms. Wood, Ms. Harberg and Mr. Bonpietro,* on the briefs).

Justice WALLACE delivered the opinion of the Court.

The issue in this appeal is whether, prior to accepting a guilty plea relating to a fourth-degree criminal sexual contact charge, the trial court must inform defendant of the civil commitment possibilities of the New Jersey Sexually Violent Predator Act (Act), *N.J.S.A.* 30:4–27.24 to –27.38. We hold that fundamental fairness requires that prior to accepting a plea to a predicate offense, the trial court must inform a defendant of the possible consequences under the Act.

## I.

In the early morning of April 12, 1999, defendant, Jerry L. Bellamy, and the eighteen-year-old victim went to defendant's motel room in Atlantic City. The victim left the room later that morning and reported to the police that, after she refused to have sex with defendant, he pushed her down on the bed and forcibly engaged in sexual intercourse with her.

The police went to defendant's motel room to investigate the alleged incident. Defendant stated that the victim agreed to have sex with him for money. However, he claimed she demanded

more money than originally agreed upon, so he went to the motel desk clerk to recover his ten-dollar telephone deposit. He then returned to the room wherein he engaged in consensual sex with the victim.

Defendant was indicted for second-degree sexual assault (Count One), *N.J.S.A.* 2C:14-2c, and fourth-degree criminal sexual contact (Count Two), *N.J.S.A.* 2C:14-3b. Prior to trial, defendant entered into a plea agreement with the State wherein he agreed to plead guilty to Count Two in exchange for the State agreeing to dismiss Count One and recommending an eighteen-month jail sentence. When asked by the trial court for the factual basis for his plea, defendant stated: "I did it [sic] purpose of—of money. I mean it was sexual money. We didn't have sex." Defendant then claimed that the sex was consensual, and the court suggested that defense counsel confer with his client about his plea. Defense counsel represented that defendant was confused and thought he was being asked to admit to the more serious sexual assault charge in Count One. Defendant then admitted using physical force and the following colloquy occurred between the trial court and defendant:

Court: Used force?

Defendant: Yes, sir.

Court: So she was not willing then.

Defendant: No sir.

Court: All right, now, Mr. Bellamy, do you understand that you don't have to plead guilty to anything and that you have a right to have a trial before a jury? Do you understand what that means?

Defendant: Yes, Your Honor.

Court: And if you're not guilty and you want to have a trial, that's fine. You don't have to plead guilty to something—

Defendant: I'm guilty.

Court:—that you don't—

Defendant: No, I'm—I'm guilty, Your Honor.

Court: Okay. All right. But once you plead guilty, then you're giving up your legal right to ever have a trial on these charges. Do you understand that?

Defendant: Yes, Your Honor.

The trial court accepted defendant's guilty plea to Count Two. At sentencing, the trial court dismissed Count One, and imposed

an eighteen-month prison term on Count Two, subject to a psychological/psychiatric examination once defendant was paroled. Defendant received 365 days of jail credit and 74 days of gap time credit. Thus, at his sentencing on June 23, 2000, defendant's final date for his eighteen-month sentence was September 1, 2000.

On August 23, 2000, just prior to the completion of defendant's sentence, the Attorney General filed a Petition for Civil Commitment pursuant to the Act. The petition asserted that defendant's conviction for fourth-degree criminal sexual contact was "a sexually violent offense" as defined in the Act and that two physicians had completed clinical certificates identifying defendant as a sexually violent predator.

Defendant's prior criminal history was set forth as follows: (1) in January 1994 defendant was arrested and charged with kidnapping, aggravated sexual assault, sexual assault, criminal restraint, and sexual contact (he pled guilty to second-degree sexual assault and received a five-year sentence in March 1995); and (2) in July 1998, he was arrested and charged with criminal sexual contact (the charge was later amended to harassment and ultimately dismissed in October 1998). At the hearing on the petition, the court found that defendant's fourth-degree conviction of criminal sexual contact was a predicate offense and defendant qualified for commitment pursuant to the Act. Defendant was committed under the Act and has remained in commitment status ever since.

Meanwhile, defendant appealed his conviction for fourth-degree criminal sexual contact. He argued that he should be allowed to withdraw his guilty plea because (1) the trial court failed to inform him that his guilty plea would qualify him for potentially indefinite commitment under the Act; and (2) that even if the trial court had no duty to inform him of the possibility of commitment under the Act, his attorney was ineffective in failing to do so.

The Appellate Division affirmed in an unpublished opinion. The panel held that potential commitment under the Act was neither a direct nor a penal consequence of his conviction of fourth-degree criminal sexual contact and, therefore, the failure of the trial court

to inform defendant of potential commitment under the Act did not provide a basis for withdrawal of the plea. The panel affirmed the conviction without prejudice to defendant raising his ineffective assistance of counsel claim in any post-conviction relief proceeding. We granted certification. *State v. Bellamy,* 175 *N.J.* 76, 812 *A.*2d 1108 (2002).

## II.

It is clear that before accepting a guilty plea, the trial court must be satisfied that (1) there is a factual basis for the plea, (2) the plea is made voluntarily, and (3) defendant understands the nature of the charge and the consequences of the plea. *State ex rel. T.M.,* 166 *N.J.* 319, 325, 765 *A.*2d 735 (2001); *State v. Barboza,* 115 *N.J.* 415, 420–21, 558 *A.*2d 1303 (1989); *State v. Howard,* 110 *N.J.* 113, 122, 539 *A.*2d 1203 (1988). Those requirements are codified under our rules. *R.* 3:9–2. However, a trial court's duty to ensure that a defendant understands the consequences of a plea generally extends only to those "consequences that are 'direct,' or 'penal,' and not to those that are 'collateral.' " *Howard, supra,* 110 *N.J.* at 122, 539 *A.*2d 1203 (citing *State v. Heitzman,* 209 *N.J.Super.* 617, 622, 508 *A.*2d 1161 (App.Div.1986), *aff'd o.b.,* 107 *N.J.* 603, 527 *A.*2d 439 (1987)).

The practice of plea bargaining has become institutionalized in our criminal justice system. *State v. Thomas,* 61 *N.J.* 314, 321, 294 *A.*2d 57 (1972); *R.* 3:9–3. "Notions of fairness apply to each side in the plea bargaining process." *State v. Warren,* 115 *N.J.* 433, 443, 558 *A.*2d 1312 (1989). A defendant has the right not to be "misinformed" about a material element of a plea agreement, *State v. Nichols,* 71 *N.J.* 358, 361, 365 *A.*2d 467 (1976), and to have his or her "reasonable expectations" fulfilled. *Howard, supra,* 110 *N.J.* at 122, 539 *A.*2d 1203 (citing *State v. Marzolf,* 79 *N.J.* 167, 183, 398 *A.*2d 849 (1979)).

Further, our rules provide that a defendant may seek to withdraw a guilty plea. *R.* 3:21–1. Generally, a defendant seek-

ing to vacate a plea must show that he or she was misinformed of the terms of the agreement or that his or her reasonable expectations were violated. *Howard, supra,* 110 *N.J.* at 123, 539 *A.*2d 1203. Defendant is also entitled to withdraw a guilty plea if the court imposes a harsher sentence than that contemplated by the plea agreement. *Warren, supra,* 115 *N.J.* at 443, 558 *A.*2d 1312. To vacate his plea, a defendant must show that he or she was prejudiced by enforcement of the agreement. *Howard, supra,* 110 *N.J.* at 123, 539 *A.*2d 1203. However, the plea should not be vacated if knowledge of the missing conditions would not have affected defendant's decision to plead. *Ibid.* The withdrawal of a guilty plea is within the broad discretion of the trial court. *R.* 3:21–1; *State v. Simon,* 161 *N.J.* 416, 444, 737 *A.*2d 1 (1999) (citation omitted).

### III.

The Appellate Division rejected defendant's claim that the trial court should have informed him of potential commitment under the Act when he pled guilty to criminal sexual contact. In rejecting that contention, the panel recognized that the trial court must advise a defendant of "the direct and penal consequences" of a guilty plea, but need not inform a defendant of all potential collateral consequences. First, the panel concluded that civil commitment under the Act was not a direct consequence of defendant's guilty plea because it did not automatically result from the conviction; rather, a conviction of a predicate offense merely triggered eligibility for civil commitment. Second, applying the standard articulated in *Doe v. Poritz,* 142 *N.J.* 1, 46, 662 *A.*2d 367 (1995), the panel characterized the legislative intent of the Act as regulatory in nature and determined that any punitive impact was simply "an inevitable consequence" of the regulation. The panel concluded that the trial court had no obligation to inform defendant about potential commitment under the Act.

Recently, another panel of the Appellate Division reached the same conclusion. *State v. Mumin,* 361 *N.J.Super.* 370, 384–85, 825 *A.*2d 1144 (App.Div.2003).

## IV.

The Act provides for the civil commitment of individuals proven to be "sexually violent predators" by clear and convincing evidence. *N.J.S.A.* 30:4–27.25; *In re Commitment of W.Z.*, 173 *N.J.* 109, 120, 801 *A.*2d 205 (2002). The Act defines a "sexually violent predator" as

[a] person who has been convicted ... of a sexually violent offense ... and suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment.

[*N.J.S.A.* 30:4–27.26.]

A "sexually violent offense" includes: aggravated sexual assault; sexual assault; aggravated criminal sexual contact; certain kidnapping charges; criminal sexual contact; felony murder (if the underlying crime is sexual assault); an attempt to commit any of the enumerated offenses; or any criminal offense with substantially the same elements as the enumerated offenses under New Jersey law, federal law, or the law of any other state. *Ibid.* The phrase "likely to engage in acts of sexual violence" means "the propensity of a person to commit acts of sexual violence is of such a degree as to pose a threat to the health and safety of others." *Ibid.* Commitment under the Act is contingent on proof of past sexually violent behavior, a current mental condition, and a demonstrated inability to adequately control one's sexually harmful conduct. *In re Commitment of W.Z., supra,* 173 *N.J.* at 127, 801 *A.*2d 205.

Pursuant to the Act, the Attorney General is permitted to initiate commitment proceedings of inmates who are scheduled for release upon expiration of a maximum term of incarceration or of any person, upon submission to the court of two clinical certificates for a sexually violent predator. *N.J.S.A.* 30:4–27.28b to 1–27.28d. Clear and convincing proof is required for commitment. *N.J.S.A.* 30:4–27.32a.

The Department of Corrections is charged with providing a safe and secure facility to house "sexually violent predators" apart

from others in the Department's custody. *N.J.S.A.* 30:4–27.34a. Committed individuals must undergo treatment, periodic psychiatric reviews, and annual court review hearings for the purpose of assessing the need for continued commitment. *N.J.S.A.* 30:4–27.34b, –27.35.

## V.

 Defendant contends that civil commitment under the Act is a direct and penal consequence of his plea, whereas the State contends it is a collateral consequence.

 Traditionally, the determination of whether defendant must be informed of certain consequences of his plea turns on whether those consequences are "direct or penal," in which case defendant must be informed, or "collateral," in which case defendant need not be informed. *State v. Heitzman,* 209 *N.J.Super.* 617, 622, 508 *A.*2d 1161 (App.Div.1986), *aff'd o.b.,* 107 *N.J.* 603, 527 *A.*2d 439 (1987).

In *Doe v. Poritz,* the Court considered whether the New Jersey sex offender registration and community requirements of Megan's Law were penal and set forth the tests to determine whether the law inflicted punishment.

The determination of punishment has ordinarily consisted of several components. An initial inquiry is whether the legislative intent was regulatory or punitive: if the latter, that generally is the end of the inquiry, for punishment results; if the former, the inquiry changes to whether the impact, despite the legislative intent to regulate, is in fact punitive, usually analyzed in terms of the accepted goals of punishment, retribution and deterrence. Despite some ambivalent language, a punitive impact—one that effects retribution or accomplishes deterrence—renders the law or the specific provision of the law that is attacked, punishment, but only if the sole explanation for that impact is a punitive intent. In other words, the law is characterized as regulatory in accordance with the legislative intent even if there is some punitive impact, if that impact is simply an inevitable consequence of the regulatory provisions themselves. The law is characterized as punitive only if the punitive impact comes from aspects of the law unnecessary to accomplish its regulatory purposes—that is, if the law is "excessive," the excess consisting of provisions that cannot be justified as regulatory, that result in a punitive impact, and that, therefore, can only be explained as evidencing a punitive intent.

[*Doe v. Poritz, supra,* 142 *N.J.* at 46, 662 *A.*2d 367.]

Applying this standard to the Act, we agree with the panel that the Legislative intent is regulatory. The Act focuses on a sex offender's mental condition and the dangers posed to the public. *Ibid.* Although the confinement is onerous and has some punitive impact, that impact is the "inevitable consequence of the regulatory provisions." *Ibid.* That is, the impact is not solely attributable to a punitive legislative intent. *Ibid.*

Moreover, commitment pursuant to the Act is not a direct consequence of pleading guilty to a predicate sexual offense because commitment does not automatically flow from the conviction. As noted, the Attorney General must initiate the involuntary commitment procedure. *N.J.S.A.* 30:4–27.28a. The court shall only order commitment if it finds "there is probable cause to believe that the person is a sexually violent predator in need of involuntary commitment." *N.J.S.A.* 30:4–27.28g. Consequently, a person may be convicted of a predicate sex offense, and yet not be committed under the Act because the evidence is not sufficient to find that his or her present mental condition creates a likelihood of future sexually violent behavior. We conclude, as the panel did below, that civil commitment under the Act is a collateral consequence of defendant's plea.

Despite our agreement with the panel that commitment under the Act is neither penal nor direct, we conclude that fundamental fairness requires that the trial court inform a defendant of the possible consequences under the Act. A defendant who has committed a predicate offense may be faced with commitment under the Act for a period in excess of his or her sentence. *Rule* 3:9–2 requires the court to determine whether a defendant clearly understands "the nature of the charge and the consequences of the plea." *R.* 3:9–2.

As Chief Justice Wilentz observed in his dissent in *Heitzman,* "[i]t matters little if the consequences are called indirect or collateral when in fact their impact is devastating." *Heitzman, supra,* 107 *N.J.* at 606, 527 *A.*2d 439 (Wilentz, C.J., dissenting) ("Whether a court should be required to advise defendant of

certain consequences of a guilty plea should not depend on ill-defined and irrelevant characterizations of those consequences"); *see also State v. Garcia,* 320 *N.J.Super.* 332, 337, 727 *A.*2d 97 (App.Div.1999).

A panel of the Appellate Division recently described the severity of confinement under the Act:

> Confinement under the [Act] is theoretically without end. In that sense, it constitutes a greater liberty deprivation than that imposed upon a criminal defendant who, in all but a handful of cases, is given a maximum release date. A more onerous impairment of a person's liberty interest is difficult to imagine.
>
> [*In re Civil Commitment of D.L., supra,* 351 *N.J.Super.* at 90, 797 *A.*2d 166.].

This Court has also recognized that commitment pursuant to the Act, like any civil commitment proceeding, demands a balancing between an individual's liberty interests and well-recognized state interests, including the police power to protect the community and *parens patriae* power to care for citizens who are unable to care for themselves. *In re Commitment of W.Z., supra,* 173 *N.J.* at 125, 801 *A.*2d 205. Thus, "because of the significant restraint on the liberty of a committee, the commitment process is bounded by constitutional procedural guarantees...." *Id.* at 125–26, 801 *A.*2d 205 (citations omitted).

We continue to stress the necessity of determining whether a consequence is direct or penal when analyzing whether a defendant must be informed of a particular consequence. However, when the consequence of a plea may be so severe that a defendant may be confined for the remainder of his or her life, fundamental fairness demands that the trial court inform defendant of that possible consequence. The failure of either the court or defense counsel to inform defendant that a possible consequence of a plea to a predicate offense under the Act is future confinement for an indefinite period deprives that defendant of information needed to make a knowing and voluntary plea. *R.* 3:9–2. In the future, prior to accepting a plea to a predicate offense under the Act, the trial court should ensure that a defendant understands that, as a result of his or her plea, there is a possibility of future commit-

ment and that such commitment may be for an indefinite period, up to and including lifetime commitment.

We direct that the Criminal Practice Committee and the Administrative Director revise the plea form to include an appropriate reference to the Act for use in all cases where defendant pleads guilty to a predicate offense under the Act.

## VI.

In devising an appropriate remedy in this case, we are mindful that, beyond the offense herein, defendant was previously convicted of a predicate offense under the Act. That is, the offense for which he pled guilty may not be the only predicate offense for defendant. Nevertheless, it was his conviction of fourth-degree sexual contact that precipitated the Attorney General's decision to move for defendant's commitment. However, defendant did not move to vacate his plea, but rather sought to have his plea withdrawn as part of his direct appeal. Because we conclude that defendant should have been informed of the consequences of the Act before the trial court accepted his plea, we find the appropriate remedy is to remand to permit defendant to move to withdraw his plea. If the trial court is satisfied that defendant did not understand the consequences of his plea, it shall permit defendant to withdraw his plea "in the interest of justice to correct a manifest injustice," *R.* 3:21-1, and shall reinstate the charges.

## VII.

Finally, we address whether our decision should be given prospective or retroactive application. We conclude that because the rule we announce today rests on this Court's standards for criminal justice, the decision should be given a limited retroactive application.

There are four possible options in the prospective-retroactive inquiry: (1) prospective only—applying only to cases with operative facts that arise after the new rule is announced; (2)

limited prospective application—applying the new law to future cases and to the parties in the case announcing the new law and applying the old rule to all other pending and post litigation; (3) limited retroactivity—applying to the cases described in (1) and (2) and to all cases where the parties have not yet exhausted all avenues of direct review and (4) complete retroactivity—applying the rule to all past, present and future cases. *State v. Nash*, 64 *N.J.* 464, 469–70, 317 *A.*2d 689 (1974).

The prospective-retroactive inquiry involves two steps. *State v. Johnson*, 166 *N.J.* 523, 546, 766 *A.*2d 1126 (2001). First, this Court must consider whether a given decision creates a new rule of law, a new obligation on the State, or was not dictated by precedent existing at the time of the initial proceedings. *Ibid.* (citing *State v. Knight*, 145 *N.J.* 233, 250–51, 678 *A.*2d 642 (1996)). This decision announces a new rule of law not dictated by existing precedent and places a new obligation on the courts to inform a defendant of a consequence that is neither direct nor penal relating to his or her plea.

Second, this Court must consider three factors to determine whether a rule should be applied retroactively: (1) the purpose of the rule and whether it would be furthered by a retroactive application; (2) the degree of reliance placed on the old rule by those who administered it; and (3) the effect a retroactive application would have on the administration of justice. *Ibid.* (citations omitted). When a decision creates a new rule of law or imposes a new obligation on the State, we have generally avoided complete retroactivity when such an application would undermine the validity of a large number of convictions. *Id.* at 547, 766 *A.*2d 1126 (citing *Knight, supra*, 145 *N.J.* at 252, 678 *A.*2d 642). Moreover, we have consistently applied new rules of criminal procedure with limited retroactivity. *See, e.g., id.* at 547, 766 *A.*2d 1126; *State v. Purnell*, 161 *N.J.* 44, 54–57, 735 *A.*2d 513 (1999); *State v. Brimage*, 153 *N.J.* 1, 25–26, 706 *A.*2d 1096 (1998); *Knight, supra*, 145 *N.J.* at 258, 678 *A.*2d 642; *State v. Abronski*, 145 *N.J.* 265, 268,

678 *A*.2d 659 (1996); *State v. Haliski,* 140 *N.J.* 1, 24, 656 *A*.2d 1246 (1995).

In a case similar to the instant matter, *State v. Lark,* 117 *N.J.* 331, 567 *A*.2d 197 (1989), this Court applied limited retroactive effect to the rule announced in *State v. Howard,* 110 *N.J.* 113, 539 *A*.2d 1203 (1988). *Lark, supra,* 117 at 341, 567 *A*.2d 197. The *Howard* Court held that prior to accepting a guilty plea, a trial court must inform a defendant of the parole consequences of a sentence to the Adult Diagnostic and Treatment Center (Avenel). *Howard, supra,* 110 *N.J.* at 125, 539 *A*.2d 1203. In *Lark,* this Court concluded that the limited retroactive effect should apply because: (1) the purpose of the rule was to ensure that a defendant eligible for an Avenel sentence and pleading guilty "clearly understands the nature of the charge and the consequence of the plea," *Lark, supra,* 117 *N.J.* at 340, 567 *A*.2d 197; (2) trial courts routinely relied upon the old rule that did not require them to explain parole ramifications of an Avenel sentence to a pleading defendant; and (3) that "limited retroactivity best serves the interests of justice" due to the large numbers of inmates confined at Avenel. *Id.* at 341, 567 *A*.2d 197.

We reach the same conclusion here. The purpose of the rule announced herein is to ensure that a defendant eligible for commitment under the Act clearly understands the nature and the consequences of the plea. However, trial courts routinely have not informed defendants of the consequences because those consequences are not direct and penal consequences of the plea. While we do not know the exact number of defendants who pled guilty to a predicate offense without knowing the possible consequences under the Act and were later committed, we recognize that full retroactivity of this decision would have a disruptive effect on the administration of justice. The lack of data regarding the number and kinds of cases that would be affected by a rule of complete retroactivity and the impact that complete retroactivity would have on the administration of justice mandates that the new rule should apply only to cases pending direct review at the time of the

rule's announcement. *See State v. Czachor,* 82 *N.J.* 392, 409–10, 413 *A.*2d 593 (1980).

We conclude that the rule announced in today's decision—that prior to accepting a guilty plea to a predicate offense, trial courts must inform defendants of possible consequences under the Act—shall be applied in this case and those cases pending in which the defendant has not yet exhausted all avenues of direct review.

## VIII.

The judgment of the Appellate Division is reversed. This case is remanded for proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, and ALBIN—6.

*Opposed*—None.