17 A.3d 227 (2011)
419 N.J. Super. 365
STATE of New Jersey, Plaintiff-Respondent,
v.
Frensel GAITAN, Defendant-Appellant.
No. A-0197-09T4.
Superior Court of New Jersey, Appellate Division.
Submitted December 1, 2010.
Decided February 7, 2011.
*228 Yvonne Smith Segars, Public Defender, attorney for appellant (Gregory P. Jordan, Designated Counsel, on the brief).
Paula T. Dow, Attorney General, attorney for respondent (Frank J. Ducoat, Deputy Attorney General, of counsel and on the brief).
Before Judges CUFF, FISHER and SIMONELLI.
The opinion of the court was delivered by
FISHER, J.A.D.
In this appeal, we consider whether the recent decisions in Padilla v. Kentucky, 559 U.S. ___, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010), and State v. Nuñez-Valdéz, 200 N.J. 129, 975 A.2d 418 (2009), should apply to this noncitizen defendant's argument, raised for the first time in his post-conviction relief (PCR) petition, that his attorney failed to discuss with him the deportation consequences of his guilty plea.

I
On June 27, 2005, defendant pled guilty to third-degree distribution of a controlled dangerous substance within 1000 feet of a school, N.J.S.A. 2C:35-7, and, on October 7, 2005, was sentenced to a five-year probationary term. Defendant did not file a direct appeal. Instead, on May 28, 2008, defendant filed a PCR petition claiming the ineffectiveness of his counsel.
The PCR judge denied defendant's petition, and he appealed, raising the following issues for our consideration:
I. THE COURT ERRED BY NOT ALLOWING ORAL ARGUMENT WHEREIN THE PETITIONER COULD HAVE MORE FULLY EXPLAINED THE PRIMA FACIE CASE OF INEFFECTIVE ASSISTANCE OF COUNSEL.
II. IT WAS ERROR NOT TO ALLOW THE DEFENDANT AN EVIDENTIARY HEARING OR GRANT HIS APPLICATION FOR POST-CONVICTION RELIEF.
A. THE PETITIONER SHOULD BE PERMITTED TO WITHDRAW HIS PLEA.
III. PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.
A. TRIAL COUNSEL FAILED TO ADVISE THE PETITIONER OF THE COLLATERAL CONSEQUENCES OF HIS PLEA.
IV. THE TRIAL COURT ERRED BY FAILING TO ASCERTAIN WHETHER DEFENDANT UNDERSTOOD THE CONSEQUENCES OF HIS PLEA.
We agree defendant was erroneously denied an evidentiary hearing concerning whether he received the effective assistance of counsel regarding the deportation consequences of his guilty plea and remand for that purpose.[1]

*229 II
The PCR judge denied relief based on defendant's affirmative response to the plea form's Question 17, which inquired whether he understood "that if you are not a United States citizen or national, you may be deported by virtue of your plea of guilty." The judge also relied on the colloquy at the plea hearing, concluding that defendant's statements at that time demonstrated he "entered into [the plea] agreement with full knowledge that there could be collateral immigration consequences."
A few months after the PCR judge rendered his decision, our Supreme Court decided Nuñez-Valdéz, which not only rejected application of the traditional direct/collateral methodology[2] in this context, but also determined that a simple "yes" answer to Question 17 was not conclusive in determining whether an attorney was effective, 200 N.J. at 141-42, 975 A.2d 418, and, in fact, concluded Question 17 required further "refinement," id. at 144, 975 A.2d 418. As a result, the PCR judge's considerable reliance on defendant's affirmative response to Question 17 was erroneous.
As mentioned, the PCR judge also relied on the following colloquy during defendant's plea hearing:
Q. You have no difficulty reading or writing?
A. No.
. . . .
Q. Did you then with your attorney read and discuss the four pages that make up the plea agreement?
A. Yes.
Q. Did you read, understand, truthfully answer all questions on each page?
A. Yes.
Q. Were those answers circled as you gave them?
A. Yes.
Q. When each page had been filled in, completed, did you understand what it said?
A. Yes.
Q. Did you put your initials at the bottom of pages 1 and 2?
A. Yes.
Q. Sign your name to page 3 and 4?
A. Yes.
Q. Did you do that voluntarily?
A. Yes.
At first blush, this testimony may seem inconsistent with defendant's certification in support of post-conviction relief; however, closer examination of the latter suggests otherwise:
5. In discussing the plea form with me[,] [my attorney] asked me "Are you a citizen" to which I replied "No, I'm a [l]awful [p]ermanent [r]esident."
6. [My attorney] did not discuss with me the possible implications of a guilty plea on my immigration status. Specifically, he did not advise me that I might become subject to removal as a result of *230 a guilty plea to the offer made by the Office of the Prosecutor.
7. I had no personal knowledge that a guilty plea might result in the initiation of removal proceedings against me.
Defendant's testimony during the plea hearing and the PCR certification are not incompatible. The words "deportation," "removal" or "citizen" were never uttered at the plea hearing. The closest the judge came to inquiring about the potential for deportation or about any such discussions between defendant and his attorney was when he asked defendant whether his attorney discussed the four pages of the plea form. Defendant does not deny in his PCR certification that his attorney asked whether he was a citizen, but when defendant said he was a legal permanent resident, defendant claims there was no discussion about the deportation possibilities. The sworn statements given at both the plea hearing and in the PCR certification are not inconsistent and the PCR judge was mistaken in holding otherwise.[3]
Because neither defendant's response to Question 17 nor his testimony at the plea hearing are inconsistent with his contentions in the PCR certificationthe two bases upon which post-conviction relief was deniedwe conclude that defendant was entitled to an evidentiary hearing as to the content and scope of his attorney's advice, if any, regarding his potential removal from the country.

III
The only potential obstacle to a remand for an evidentiary hearing is the State's argument that Nuñez-Valdéz and Padilla should not be applied here. This argument is convoluted by the fact that these recent decisions contain or presuppose multiple principles, some of which are undoubtedly new and some of which are not. In any given case, whether or to what extent those principles may be given retroactive effect turns on the nature of the ineffectiveness argument, that is, whether the attorney gave incorrect advice, no advice, or only forecasted the possibility or probability of deportation. For the reasons that follow, we conclude that what is relevant about these recent decisions is not new and what is new about them is not relevant to the matter at hand.
The State concedes that insofar as Nuñez-Valdéz determined that the rendering of incorrect advice meets the first prong of the test for ineffectiveness,[4] it does not constitute a new rule, citing, among others, State v. Garcia, 320 N.J.Super. 332, 339, 727 A.2d 97 (App.Div.1999). While the State's contention in this regard is certainly true, it is not relevant since defendant does not contend he received bad advice, only that he received no advice.
We discern from its arguments that the State views the rendering of no advice as *231 requiring a different approach from that taken when a defendant contends an attorney rendered bad advice. We reject this contention for the same reasons enunciated by Justice Stevens for the Court in Padilla:
[a] holding limited to affirmative misadvice would invite two absurd results. First, it would give counsel an incentive to remain silent on matters of great importance, even when answers are readily available. Silence under these circumstances would be fundamentally at odds with the critical obligation of counsel to advise the client of "the advantages and disadvantages of a plea agreement." Libretti v. United States, 516 U.S. 29, 50-51, 116 S.Ct. 356 [368] 133 L.Ed.2d 271 [290] (1995). When attorneys know that their clients face possible exile from this country and separation from their families, they should not be encouraged to say nothing at all. Second, it would deny a class of clients least able to represent themselves the most rudimentary advice on deportation even when it is readily available. It is quintessentially the duty of counsel to provide her client with available advice about an issue like deportation and the failure to do so "clearly satisfies the first prong of the Strickland analysis." Hill v. Lockhart, 474 U.S. 52, 62, 106 S.Ct. 366 [372], 88 L.Ed.2d 203 [212] (1985) (White, J., concurring in judgment).
[Padilla, supra, 559 U.S. at ___, 130 S.Ct. at 1484, 176 L.Ed.2d at 296-97.]
The State's argument that the "no advice" scenario, found sufficient to meet the first prong of the Strickland test in Padilla, is a new rule that should be applied only prospectively is without merit. In fact, the Padilla Court relied upon "the weight of prevailing professional norms" in so holding, citing authorities that preexisted defendant's guilty plea in this case. Id. at ___, 130 S.Ct. at 1482-83, 176 L.Ed.2d at 294-95. Its holding that no advice is the equivalent of misadvice is not new. Thus, an attorney's rendering of bad advice or the failure to give any advice regarding deportation satisfied the first prong of the Strickland test at the time defendant pled guilty.[5]
In this same vein, it also appears the State views Nuñez-Valdéz's rejection of the direct/collateral methodology as a new rule that ought not be applied retroactively.[6] That argument may be accurate as a matter of state constitutional law, but the Padilla Court recognized that it had "never applied a distinction between direct and collateral consequences to define the scope of constitutionally `reasonable professional assistance' required under Strick-land. . . ." *232 559 U.S. at ___, 130 S.Ct. at 1481, 176 L.Ed.2d at 293. Rather than create a new rule, the Court held that existing federal law compelled its rejection of Kentucky's direct/collateral approach. As a result, our Supreme Court's rejection of the direct/collateral methodology in this context in Nuñez-Valdézwhether or not that constitutes a new rule for purposes of state constitutional lawhas no direct impact here; when being advised to plead guilty, defendant was entitled to the benefits of federal constitutional law, which has never recognized the direct/collateral methodology.
To be sure, Padilla announces a new rule, which, in the Court's words, "now" requires that counsel inform the noncitizen client "whether his plea carries a risk of deportation." 559 U.S. at ___, 130 S.Ct. at 1486, 176 L.Ed.2d at 299. Defendant's ineffectiveness claim here, however, is not based on his attorney's failure to advise whether deportation would occur but only on the attorney's alleged failure to give any advice. We, thus, need not presently determine whether or to what extent the new aspect of Padilla might apply here.[7]
To summarize, what may arguably be viewed as "new" in Nuñez-Valdézthe rejection of the direct/collateral methodologyis not a new federal concept. And what may be viewed as "new" in Padilla that counsel must now "inform [the] client whether his plea carries a risk of deportation," 559 U.S. at ___, 130 S.Ct. at 1486, 176 L.Ed.2d at 299is not relevant here, or at least not until the facts are further illuminated at the evidentiary hearing required.

IV
Lastly, we would note that even were we to agree with the State that the standard required of defense counsel in this case necessarily relies on the new aspects of the recently-decided cases of Padilla or Nuñez-Valdéz, or both, we do not agree they should not be applied here. Our Supreme Court has traditionally applied new rules of criminal practice and procedure at least to cases in the pipeline existing at the time. See, e.g., State v. Natale, 184 N.J. 458, 494, 878 A.2d 724 (2005); Bellamy, supra, 178 N.J. at 142-43, 835 A.2d 1231.
Here, defendant's PCR petition was denied on March 20, 2009. Nuñez-Valdéz was decided on July 27, 2009, and defendant filed an appeal from the denial of his PCR petition on August 28, 2009; although defendant's appeal was not literally "in the pipeline" at the moment Nuñez-Valdéz was decided, the fact that Nuñez-Valdéz was decided shortly after the aggrieving order and before the filing of a notice of appealthe timeliness of which has not been challengedsuggests the fairness of including defendant's appeal as entitled to the benefit of Nuñez-Valdéz. Moreover, defendant's appeal was certainly in the pipeline when Padilla was decided on March 31, 2010.
It bears further observation that in unpublished decisions since Nuñez-Valdéz, we have remanded similar matters to the trial courts for reconsideration of defendant's ineffectiveness arguments in light of Nuñez-Valdéz. And, by remanding a matter to this court to reconsider an ineffectiveness argument in light of its decision in Nuñez-Valdéz, see State v. McIntyre, 200 N.J. 365, 981 A.2d 1277 (2009),[8] the Court *233 implicitly concluded that Nuñez-Valdéz should at least apply to cases pending in our appellate courts at the time of decision.[9]
Reversed and remanded for further proceedings in conformity with this opinion. We do not retain jurisdiction.
NOTES
[1] Defendant also argued in the trial court that his counsel was ineffective for failing to pursue the alleged fact that defendant was not informed of his Miranda rights when arrested and for allegedly failing to sufficiently investigate defendant's claim of innocence. Those arguments have not been pursued in this court and are, therefore, waived. State v. Robinson, 200 N.J. 1, 20, 974 A.2d 1057 (2009).
[2] In State v. Bellamy, 178 N.J. 127, 137, 835 A.2d 1231 (2003), the Court explained the direct/collateral methodology in the following way: "Traditionally, the determination of whether defendant must be informed of certain consequences of his plea turns on whether those consequences are `direct or penal,' in which case defendant must be informed, or `collateral,' in which case defendant need not be informed." The Court rejected that approach as having no relevance in determining the effectiveness of an attorney who failed to advise a defendant pleading to a sex offense of the possibility of involuntary civil commitment. Id. at 138-39, 835 A.2d 1231.
[3] Moreover, even if the plea testimony and the PCR certification were in conflict, the PCR judge could not find the former more credible than the latter absent an evidentiary hearing because he did not have the opportunity to see and hear defendant testify on any occasion. This is not to suggest, however, that a judge, who presided over the earlier phase, may not consider his or her view of a defendant's credibility in ruling on a PCR petition. But, when a PCR judge, as here, has not had the opportunity to see and hear the defendant testify, the PCR judge may not assign greater credibility to one written sworn statement over another.
[4] Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Fritz, 105 N.J. 42, 519 A.2d 336 (1987). Nuñez-Valdéz's holding is actually limited to determining what is required by Fritz, since the Court "elect[ed] to decide this case under our state constitution." 200 N.J. at 139, 975 A.2d 418. As will be seen, Strickland imposes more extensive obligations on an attorney representing a noncitizen than does Fritz.
[5] Such an allegation would also likely satisfy the first prong of the test at the time defendant pled guilty insofar as New Jersey law is concerned. The plea form used here contained Question 17, which was undoubtedly intended to engender a discussion between counsel and the accused about deportation. That question, in one form or another, has been used by our courts since 1988, as a response to Chief Justice Wilentz's dissent in State v. Heitzman, 107 N.J. 603, 606-08, 527 A.2d 439 (1987), thus establishing a professional norm existing at the time defendant discussed the plea agreement with his attorney. See AOC Administrative Directive # 1-1988 (Jan. 15, 1988).
[6] Certainly, in deciding Nuñez-Valdéz, the Court for the first time jettisoned the direct/collateral methodology in deportation circumstances. Whether that aspect of Nuñez-Valdéz should be viewed as a new rule or nota matter we need not decidecertainly the direct/collateral methodology's demise was foreshadowed years earlier by the Court. See Bellamy, supra, 178 N.J. at 138-39, 835 A.2d 1231 (deeming the direct/collateral methodology unhelpful in determining whether an individual pleading guilty to a sex crime should be advised of the possibilities of involuntary civil commitment).
[7] Of course, such a determination may have to be made if, at the conclusion of the evidentiary hearing required by today's judgment, the PCR judge determines that the attorney gave advice but only opined on the possibility of deportation rather than provide a firm opinion of the risk of deportation now required by Padilla.
[8] McIntyre was sentenced in 2002 and had nearly completed his prison term when, in 2005, he filed a PCR petition, which was denied. We affirmed by way of an unpublished opinion. See State v. McIntyre, No. A-1280-07, 2008 WL 5101244 (App.Div. Dec. 5, 2008). After the Supreme Court remanded, 200 NJ. 365, 981 A.2d 1277, we considered the impact of Nuñez-Valdéz and again affirmed because McIntyre's attorney had discussed the deportation consequences and had urged McIntyre to seek the advice of an immigration attorney. See State v. McIntyre, No. A-1280-07, 2009 WL 3488448 (App.Div. Oct. 30, 2009).
[9] We reject the notion that pipeline retroactivity in this setting includes only those cases in which the defendant has a direct appeal pending. Questions regarding the effectiveness of counsel are most often considered and determined by way of PCR petitions. See State v. Preciose, 129 N.J. 451, 460, 609 A.2d 1280 (1992). Pipeline retroactivity in this context logically includes those cases pending appeal of an order denying post-conviction relief.