# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3665-14T5

IN THE MATTER OF THE
CIVIL COMMITMENT OF J.S.,
SVP-24-99.

_____

Submitted January 23, 2018 — Decided August 27, 2018

Before Judges Yannotti and Leone.

On appeal from Superior Court of New Jersey,
Law Division, Essex County, Docket No. SVP-
24-99.

Joseph E. Krakora, Public Defender, attorney
for appellant J.S. (Maritza Rodriguez,
Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney
for respondent State of New Jersey (Melissa
H. Raksa, Assistant Attorney General, of
counsel; Amy Beth Cohn, Deputy Attorney
General, on the brief).

PER CURIAM

J.S. appeals from a February 6, 2015 order determining that

he continued to be a sexually-violent predator who must be civilly

committed in the Special Treatment Unit (STU) under the Sexually

Violent Predators Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38.  We

affirm.

In 1986, J.S. caused a four-year-old girl to lick his penis and caused her six-year-old brother to engage in sexual conduct. J.S. pled guilty to second-degree sexual assault, N.J.S.A. 2C:14-2(b), and was sentenced to four years of probation.

Also in 1986, J.S. repeatedly forced a four-year-old boy to perform fellatio on him, and threatened to come back and kill him. In 1992, the boy revealed J.S.'s conduct. In 1994 J.S. pled guilty to first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a), third-degree terroristic threats, N.J.S.A. 2C:12-3(a), and third-degree witness tampering, N.J.S.A. 2C:28-5(a), and was sentenced to seven years in the Adult Diagnostic & Treatment Center (ADTC).

Meanwhile, in 1994 J.S. took pictures of a nude fifteen-year-old girl. He pled guilty to second-degree and fourth-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(b)(3) and (b)(5)(b), and fourth-degree criminal sexual conduct, N.J.S.A. 2C:14-3(b), and was sentenced to seven years in prison. The two seven-year terms were concurrent.

When J.S. nearing the end of his criminal sentence in 1999, he was evaluated at the Ann Klein Forensic Center (AKFC) and was found not to satisfy the criteria for commitment to the AKFC. In 2000, the trial judge ordered J.S. to be civilly committed at the Northern Regional Unit (NRU), the predecessor of the STU.

The trial judge and other judges ordered that J.S. remain committed to the STU in various annual reviews from 2002 through 2014. We affirmed the 2003 and 2007 orders committing J.S. to the STU. In re Civil Commitment of J.S., No. A-4335-07 (App. Div. Oct. 7, 2004); In re Civil Commitment of J.S., No. A-5712-06 (App. Div. Jan. 8, 2008) (J.S. II). In J.S. II, we rejected J.S.'s contention that he should be transferred from the STU to the AKFC because it was safer and a more therapeutic setting. Id. (slip op. at 8-9).

For the commitment review at issue here, the trial judge held hearings on three days in 2014 and 2015. He heard testimony from J.S., four experts, and the CEO of the AKFC, Dr. Glenn Ferguson.

The State's expert psychiatrist, Dr. Indra Cidambi, testified that J.S. has pedophilic disorder; unspecified paraphilic disorder; and an unspecified personality disorder with antisocial features. She found they affect him emotionally, cognitively, or volitionally. The State's expert psychologist, Dr. Tarmeen Sahni, testified J.S. refused to be interviewed, but his file showed he has pedophilia, sexually attracted to both genders, non-exclusive type; paraphilia, not otherwise specified, with non-consent and sadistic features; and personality disorder, not otherwise specified, with schizotypal and antisocial traits. Both testified

these mental conditions predispose J.S. to commit acts of sexual violence.

J.S.'s expert psychiatrist, Dr. Gary Collins, testified that J.S. has pedophilic disorder, non-exclusive type, sexually attracted to both genders; conversion disorder; bipolar disorder; and personality disorder, not otherwise specified. J.S.'s expert psychologist, Dr. Timothy Foley, testified J.S. has pedophilic disorder; and bipolar disorder with strong indication of schizotypal personality disorder.

All of the experts agreed that, as a result of his mental abnormalities or disorders, J.S. has serious difficulty controlling sexually violent behavior, and that it was highly likely he would reoffend if released. Based on their testimony, the trial judge found that J.S. required continued civil commitment. On February 6, 2016, the court ordered that J.S. remain committed to the STU.

## II.

J.S. appeals. He argues:

> POINT ONE — THE STATE FAILED TO PROVIDE EFFECTIVE TREATMENT TO J.S. AS REQUIRED BY THE SVPA AND THE NEW JERSEY SUPREME COURT, ALLOWING J.S. TO LANGUISH FOR FIFTEEN YEARS WITHOUT PROPER PSYCHIATRIC CARE.
>
> POINT TWO — J.S. MUST BE RELEASED BECAUSE HE FEARS FOR HIS SAFETY AT THE STU DUE TO THE SEVERE ABUSE THAT J.S. HAS TESTIFIED HE

SUFFERED, WHICH J.S. STATED MAKES THE CONDITIONS AT STU UNBEARABLE.

POINT THREE — J.S. MUST BE RELEASED BECAUSE THE TRIAL COURT FOUND THAT HE HAS NOT MADE ANY PROGRESS IN HIS TREATMENT AT THE STU AND HE IS UNLIKELY TO MAKE ANY PROGRESS IN THE FUTURE, RENDERING HIS CONTINUED COMMITMENT AT THE STU PUNITIVE AND UNCONSTITUTIONAL.

We must hew to our "'extremely narrow'" standard of review of a commitment hearing. In re Civil Commitment of R.F., 217 N.J. 152, 174 (2014) (citation omitted). Appellate courts "give deference to the findings of our trial judges because they have the 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Ibid. (citation omitted). "So long as the trial court's findings are supported by 'sufficient credible evidence present in the record,' those findings should not be disturbed." Id. at 175.

Furthermore, "[t]he judges who hear SVPA cases generally are 'specialists' and 'their expertise in the subject' is entitled to 'special deference.'" Id. at 174 (citations omitted). "Accordingly, an appellate court should not modify a trial court's determination either to commit or release an individual unless 'the record reveals a clear mistake.'" Id. at 175.

Under the SVPA, "[i]f the court finds by clear and convincing evidence that the person needs continued involuntary commitment as a sexually violent predator, it shall issue an order authorizing

the involuntary commitment of the person to a facility designated for the custody, care and treatment of sexually violent predators." N.J.S.A. 30:4-27.32(a). Three requirements must be satisfied to classify a person as a sexually violent predator: (1) "that the individual has been convicted of a sexually violent offense"; (2) "that he suffers from a mental abnormality or personality disorder"; and (3) "that as a result of his psychiatric abnormality or disorder, 'it is highly likely that the individual will not control his or her sexually violent behavior and will reoffend.'" R.F., 217 N.J. at 173 (quoting In re Commitment of W.Z., 173 N.J. 109, 130 (2002)); see N.J.S.A. 30:4-27.26.

Appellant's convictions of aggravated sexual assault and sexual assault satisfied the "sexually violent offense" requirement. See N.J.S.A. 30:4-27.26. The trial court found by clear and convincing evidence that J.S. has serious difficulty controlling sexually violent behavior, and that it was highly likely that that he would reoffend if released. We see no basis to disturb its ruling.

J.S. does not dispute that he satisfied the statutory standard for continued civil commitment. Instead, he advances three arguments why he nonetheless should be released from the STU into the community.

J.S. argues he must be released because the STU has failed to provide him with effective treatment. The State's experts testified the STU has provided J.S. with individual therapy, group therapy, and examinations by a psychiatrist. They testified J.S. was still in Phase One of his treatment, but had attended a process group earlier in 2014. The trial court found J.S. made some progress until a psychotic episode in 2005, but made no progress since then.

The experts disagreed on why J.S. had not made progress. The State's experts testified that J.S. was malingering and had been refusing treatment for most of his fifteen years at the NRU and STU, and that he refused all forms of psychiatric treatment and medication. J.S.'s psychiatric expert Dr. Collins agreed J.S. had engaged in malingering.[1] Nonetheless, J.S.'s experts asserted he needed to undergo treatment at a psychiatric hospital and take medication.

However, J.S. was sent three times to the AKFC, a psychiatric hospital, and three times he was sent back to the STU. The AKFC records stated as follows.

---

[1] J.S.'s other expert, Dr. Foley, testified he did not see evidence of malingering. The trial court stated: "Well, I guess he really wasn't looking very hard."

In 2006, J.S. was transferred to the AKFC after starving himself for two weeks and expressing suicidal thoughts. Once there, he resumed eating. However, he said he did not need any psychiatric treatment, and he refused psychotropic medication. He refused to walk and claimed he needed a wheelchair, but there was no apparent physical basis for his claim. An AKFC psychiatrist found J.S. was "feigning [a] physical condition in order to avoid going back to the [NRU]." The AKFC sent J.S. back.

In January 2008, J.S. cut his wrist and threatened further self-harm, and was sent to the AKFC. An AKFC psychiatrist noted such circumstances were "associated with symptom simulation or exaggeration to avoid . . . harsh incarceration." Once at the AKFC, J.S. denied thoughts of self-harm and refused medication. The AKFC psychiatrist concluded J.S. did not meet the criteria for commitment to the AKFC and should be returned to the NRU.

In February 2008, J.S. refused to eat or drink for several days and was sent to the AKFC. The AKFC psychiatrist noted that such conduct was associated with trying to "avoid harsh incarceration . . . by symptom manipulation or frank malingering," and that J.S. appeared "extremely manipulative and self serving to remove himself from the treatment program at the [NRU]." Once at the AKFC, J.S. denied thoughts of self-harm, and resumed eating and drinking. J.S. again demanded a wheelchair, which was denied,

A-3665-14T5

and again was able to walk. He would not take recommended medication and was manipulative toward the treatment team. As in the prior two evaluations, an AKFC psychiatrist diagnosed J.S. as having pedophilia, paraphilia, and depressive disorder. The AKFC psychiatrist also diagnosed J.S. with "malingering," and found he did "not exhibit any type of psychosis." The AKFC psychiatrist concluded J.S. did not meet the criteria for commitment to the AKFC, and returned him to the NRU.

Thus, as the State's experts testified, the AKFC records showed that J.S. was malingering and refused psychiatric help or medication on the three occasions he went to AKFC. Nonetheless, J.S.'s experts requested that J.S. be conditionally discharged and released into the community so he could be voluntarily committed to a psychiatric hospital for appropriate treatment. However, Dr. Collins doubted J.S. would take medication voluntarily, even if released into the community. Dr. Foley testified it was his "hope" that J.S. could develop a therapeutic relationship and take medication, but would not disagree that "the only basis for [his] opinion that it might happen anywhere else is [he] hope[d] it would."

In his testimony, J.S. initially refused to answer whether he would be willing to engage in psychiatric treatment. He repeatedly noted he had been sent to other facilities that found

he did not need psychiatric treatment. He testified he would not take medications at AKFC or another facility and then return to the STU. He then said: "Treatment is one thing. Medication is last resort." He ultimately said he would agree to therapy and try psychiatric treatment, but refused to say he would take medication if recommended.

Dr. Collins suggested psychotropic medications could be administered to J.S. without his consent. The trial court conducted an extensive inquiry on whether it could order forced medication. Dr. Ferguson testified that medication could only be administered over objection if the person posed a substantial risk of serious harm to self, others, or property. The court found that J.S. did not meet that standard, and that it lacked the authority to order forced medication. J.S. states he does not appeal that finding.

The trial court also found as follows. "Without a doubt [J.S.] would not comply with conditions [for] a conditional discharge." "The problem with [J.S.'s] argument is that he's been in [AKFC] three times, been offered medication three times, and refused to take it three times." "I tried to get [J.S.] to indicate if he were sent to [AKFC] he would take medication, and he would not agree to that."

The trial court also found "there is clearly some malingering and manipulation" by J.S. However, the court believed that if he were "just doing this deliberately as a malingerer, he would have changed his tactic by now." The court concluded that, in addition to the pedophilia and personality disorders testified to by the State's experts, J.S. has "a mental illness, be it . . . a psychosis or mood disorder or bipolar disorder," which the State's experts ignored. The court found the State's experts mistakenly believed J.S. would "change his mind and stop doing what he's been doing for 10 years." The court found that "without the medication he's going to continue on as he is now."

The trial court concluded: "I think it's the responsibility of the STU to do something for him. They can't just take the position they're taking now and let this go on for another 10 years. It's . . . not right. It's not ethical. And it's their responsibility to come up with a plan to treat [J.S.]."

That responsibility rests not with the court but with the agencies which run the STU.[2] As the trial court recognized by its

---

[2] "The Department of Corrections [DOC] shall be responsible for the operation of any facility designated for the custody, care and treatment of sexually violent predators, and shall provide or arrange for custodial care of persons committed pursuant to this act." N.J.S.A. 30:4-27.34(a). "The Division of Mental Health Services in the Department of Human Services shall provide or arrange for treatment for a person committed pursuant to this act.

A-3665-14T5

order continuing J.S.'s commitment to the STU, J.S. has not shown any legal basis for release into the community.

J.S. emphasizes that treatment is one of the goals of the SVPA. "[T]he statute is designed to protect the public from dangerous predators and to treat sex offenders who are, by definition, suffering from a mental abnormality." In re Civil Commitment of W.X.C., 204 N.J. 179, 188 (2010). However, we cannot ignore that "[t]he Legislature enacted the SVPA to protect other members of society from the danger posed by sexually violent predators." In re Commitment of J.M.B., 197 N.J. 563, 570-71 (2009).

Our Legislature found that "[c]ertain individuals who commit sex offenses suffer from mental abnormalities or personality disorders which make them likely to engage in repeat acts of predatory sexual violence if not treated for their mental conditions." N.J.S.A. 30:4-27.25(a). The Legislature found it was "necessary to modify the involuntary civil commitment process in recognition of the need for commitment of those sexually violent predators who pose a danger to others should they be returned to

Such treatment shall be appropriately tailored to address the specific needs of sexually violent predators." N.J.S.A. 30:4-27.34(b).

society." N.J.S.A. 30:4-27.25(c). Such modification was needed because:

> Under the existing involuntary commitment procedure, persons are subject to commitment if they are mentally ill and dangerous to self, others or property. . . . The nature of the mental condition from which a sexually violent predator may suffer may not always lend itself to characterization under the existing statutory standard, although <u>civil commitment may nonetheless be warranted due to the danger the person may pose to others as a result of the mental condition</u>.
>
> [N.J.S.A. 30:4-27.25(b) (emphasis added).]

The Legislature found it was "necessary to house involuntarily committed sexually violent predators in an environment separate from persons committed under [the general civil commitment statutes] or otherwise confined." N.J.S.A. 30:4-27.25(d).

"The Legislative findings clearly make paramount the SVPA's intention to protect society through the 'commitment of those sexually violent predators who pose a danger to others should they be returned to society.'" <u>J.M.B.</u>, 197 N.J. at 574 (quoting N.J.S.A. 30:4-27.25(c)). The Legislature's goal of protecting the public by ensuring sexually violent predators are "confined in a secure facility for control, care and treatment" is reflected throughout the SVPA's provisions. N.J.S.A. 30:4-27.26; <u>see</u> N.J.S.A. 30:4-27.27(a); N.J.S.A. 30:4-27.32(a), (g).

"If the court determines at [an annual] review hearing that involuntary commitment as a sexually violent predator shall be continued, it shall execute a new order" continuing his commitment to such a secure facility. N.J.S.A. 30:4-27.35. A conditional discharge is only allowed if "the court finds that the person will not be likely to engage in acts of sexual violence because the person is amenable to and highly likely to comply with a plan to facilitate the person's adjustment and reintegration into the community so as to render involuntary commitment as a sexually violent predator unnecessary for that person." N.J.S.A. 30:4-27.32(c)(1). A person can be considered for unconditional discharge only "if the person's treatment team determines that the person's mental condition has so changed that the person is not likely to engage in acts of sexual violence if released." N.J.S.A. 30:4-27.36(a). As J.S. met none of those preconditions for conditional or unconditional release, and instead met N.J.S.A. 30:4-27.35's requirements for continued commitment, the trial court was required to order J.S. to remain at the STU.

J.S. notes New Jersey's general "civil commitment jurisprudence has emphasized the importance of 'provid[ing] the needed level of care in the least restrictive manner,' and not infringing on an individual's 'liberty or autonomy any more than appears reasonably necessary to accomplish' the State's goals of

public safety and effective treatment." R.F., 217 N.J. at 180 (alteration in original) (citations omitted). J.S. argues the STU has failed to provide effective treatment to him.

However, J.S. ignores his own refusal of psychiatric treatment and medication, which are available to him at the STU. Dr. Cidambi testified that "none of the psychiatrist[s] here at the STU were able to follow up with [J.S.] psychiatrically because [J.S.] has been refusing any kind of formal treatment . . . from the psychiatrists here."

Dr. Ferguson testified that, unlike the AKFC, the STU was not a "psychiatric hospital" as designated in Title Thirty. See N.J.S.A. 30:4-160; see also N.J.S.A. 30:1-7. The trial court asked if "in order to provide . . . an involuntarily committed person psychiatric treatment, would [a facility] have to be a designated psychiatric hospital?" Dr. Ferguson replied that "the only exception would be for people who were involuntarily civilly committed under a different statute like the Sexually Violent Predator Act. That also calls for mental health treatment including psychiatric treatment if . . . necessary."

Dr. Ferguson's testimony accurately reflects the SVPA. As the trial court noted, the SVPA provides that "[a] psychiatrist" may be included on an STU resident's "treatment team." N.J.S.A. 30:4-27.30(b). The treatment team "provide[s] treatment,

15

supervision or other services at a facility designated for the custody, care and treatment of sexually violent predators," namely the STU. N.J.S.A. 30:4-27.26. The SVPA regulations provide that the STU's "'clinical staff'" includes "members of treatment teams" and others who work in "psychiatry." N.J.A.C. 10A:35-1.4. Indeed, the court noted that he found "diagnoses in [J.S.'s medical records] by staff psychiatrists at the STU."[3]

Given J.S.'s refusal to accept the medication and psychiatric treatment offered him at the STU, he has not shown that his continued commitment at the STU somehow violates the treatment goal of the SVPA.

### B.

J.S. argues his continued commitment at the STU is punitive and thus unconstitutional. However, our Supreme Court has repeatedly "conclude[d] that the SVPA is neither punitive nor unfair." W.X.C., 204 N.J. at 183; see J.M.B., 197 N.J. at 599-601; State v. Bellamy, 178 N.J. 127, 137-38 (2003). The Court

---

[3] Nevertheless, the trial court stated "in order [for the STU] to provide psychiatric care, I think it has to be a psychiatric hospital." The court apparently based that belief on "the manual that was promulgated by the [Administrative Office of the Courts] and the Department of Human Services for judges." However, such a manual cannot trump the SVPA and its regulations, or the testimony of the witnesses before the court. In any event, any issue is mooted by J.S.'s refusal of the psychiatric services offered him at the STU, which would precede any psychiatric care.

"recognized that by utilizing confinement as part of treatment, the SVPA has some punitive impact." W.X.C., 204 N.J. at 189. However, the Court found that "the SVPA reflects 'a reasoned balance between the liberty interest of a [sex offender] in need of treatment for emotional disorders and protection of the citizenry.'" Ibid. (citation omitted). Because "the SVPA is remedial and strikes an appropriate balance between the safety interests of the public and the need to provide predators with treatment," the Court rejected the argument it was punitive. Id. at 189-90.

J.S. contends his lack of progress makes his commitment punitive. However, "[i]n light of the important purposes that statutes like the SVPA serve, [the Court has] cautioned courts to proceed with care, reminding them 'that the most searching inquiry is required before condemning honest laws that are free of punitive intent and designed to protect society.'" Id. at 190 (citation omitted). "[O]nly if there is a hidden punitive purpose to the SVPA's delay in offering treatment can we say that it is unconstitutional as applied." Id. at 201. J.S. has not alleged, and the trial court did not find, any such hidden punitive purpose.

Moreover, J.S.'s constitutional claim fails because he refused to accept psychiatric treatment or medication offered to him at the STU. Our Supreme Court addressed a similar issue in

17

W.X.C. There, a sex offender argued the SVPA could not constitutionally be applied to him because he had not been sent to the ADTC to get sex offender treatment before being committed to the STU. 204 N.J. at 187. The Court rejected his general challenge to the SVPA, "declin[ing] to conclude that the SVPA is transformed into a punitive, and therefore unconstitutional, enactment merely because it applies to some individuals, like defendant, who were not provided with specialized treatment prior to civil commitment." Id. at 195.

W.X.C.'s as-applied challenge was based on the criteria for admission into the ADTC. In addition to the ADTC requirements "that the sex offender's behavior satisfies the dual criteria of being repetitive and compulsive, the Legislature decided to narrow admission into [the ADTC] further by requiring that the sex offender also be amenable to treatment and willing to participate in treatment." Id. at 197; see, e.g., N.J.S.A. 2C:47-3(a), (b), (f), (h). The Supreme Court ruled the limitation of treatment to the sex offender "who is willing to participate in treatment" was appropriate and non-punitive. W.X.C., 204 N.J. at 198; see id. at 198-202. "[T]he two new requirements of amenability and willingness were intended to limit treatment at the ADTC to those repetitive and compulsive sex offenders who are able to benefit from it most." Id. at 197. "By excluding 'therapy refusers'"

from the ADTC, "the ADTC would afford better treatment to those most likely to benefit." Id. at 198 (citation omitted). The Court held: "The operation of the SVPA is neither punitive nor fundamentally unfair and we therefore reject defendant's arguments that it is unconstitutional as applied to him and other offenders like him." Id. at 202.

Similarly, the SVPA did not become punitive as to R.S. because he was unwilling to accept the treatment available at the STU, including psychiatric treatment and medication. Thus, we reject his constitutional argument.

### C.

J.S. also argues he must be released because he has suffered severe abuse at the STU. In 2000 he was sent for treatment for a broken jaw and hematoma on his head, in 2007 he was sent to the emergency room after allegedly being punched in the eye and head, and he alleged he was sexually assaulted in 2011. He also claimed his property had been sabotaged and stolen. He claimed to fear for his life. However, Dr. Cidambi testified that the STU had taken protective action after J.S.'s 2011 allegation. Dr. Sahni testified J.S.'s alleged fear of future assaults could be malingering.

J.S. similarly alleged many of these incidents in J.S. II. We noted "his complaints about safety at the STU were either

19

unsubstantiated or had been reasonably addressed by STU staff." Id. (slip op. at 8). We found the trial judge has also issued a directive that "will reasonably address such concerns going forward." Id. at 8-9. We concluded "J.S. never provided a basis on which to justify his placement in any facility other than the STU," and rejected his demand for transfer to the AKFC. Ibid.

If J.S.'s complaints were inadequate to justify his transfer to the AKFC, they are certainly inadequate to justify his release into the community. The record contains no evidence of assaults since 2011. Security concerns should be addressed to the appropriate authorities, but they are not a basis under the SVPA for releasing J.S. into the community when it is highly likely that that he will commit new acts of sexual violence if released.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3665-14T5